# DENNIS ROSS KELLEY *v.* STATE OF MARYLAND

[No. 587, September Term, 1970.]

*Decided June 9, 1971.*

252

The cause was argued before MURPHY, C. J., and ORTH and MOYLAN, JJ.

*Roger W. Titus* for appellant.

*Robert A. DiCicco, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Linthicum, Jr., State's Attorney for Montgomery County,* and *John M. King, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

In late September 1969 Davis W. Morton, a Montgomery County police officer, attended a regional meeting of narcotics officers from the District of Columbia and surrounding areas. He talked to Detective Mylan who lived next door to a Dennis Ross Kelley, (appellant) 536 Calvin Lane, Rockville, Maryland. Mylan told Morton that there was narcotic dealing carried on at that house. He had observed several persons going in and out of the premises and it appeared from all his experience that there were narcotics being dispensed. On one occasion he found Dennis Kelley "lying in the gutter and he seemed to be under the influence of a narcotic drug." Morton considered Mylan reliable because of Mylan's position on the Narcotics Squad in Washington,

D.C. "He's had plenty of time to observe what was going on in his own neighborhood." Mylan mentioned both Dennis Kelley and his brother Keith Kelley during his conversation with Morton.

On 24 October 1969 Morton went to 536 Calvin Lane and knocked on the door.[1] Appellant answered. Morton asked for either Dennis or Keith Kelley and the person at the door identified himself as Dennis. The transcript of Morton's testimony then reads:

> "At that point I asked him: Do you have any grass that you would like to sell or marijuana?
>
> He said that his brother, Keith, had some marijuana but he wasn't home at the moment.
>
> At that point he said, 'But I think I know a guy who might have some. If you want to come in I'll call.' "[2]

Appellant and Morton went into a back room and appellant called someone on the phone. He asked: "Do you have any grass?" He "held the receiver" and told Morton that the person to whom he was speaking had two nickel [$5] bags, and asked Morton: "Would you like to buy them?" Morton said: "I'm interested in an ounce but that sounds fine." Appellant then said: "Would you like to go over there and get it?" and Morton said, "Fine." They went in Morton's car to an apartment off Twinbrook Parkway in Rockville, were admitted by a woman who proved to be the mother of Kenneth Yeager and went directly to a back room where they met Yeager. Yeager said hello to appellant who introduced Morton

---

1. How Morton was dressed was not disclosed but appellant, describing his encounter with Morton while testifying on his own behalf, said "this long-bearded man" came up to the door.

2. Later in his testimony Morton was to recount "more specifically" what he said to appellant and what appellant said to him. The transcript reads:

> "I said, 'Do you have any grass that you would like to sell?'
>
> He said, 'My brother has some, but he's not home right now.' Then on top of that he said, 'But I know a guy that might have some. If you want to come in, I'll call him.' "

as his friend and said, "He's all right." Yeager unlocked a safe, took out two plastic bags and handed them to Morton; Morton gave Yeager $10. Analysis by a U. S. Chemist established that the bags contained 6.13 grams of marijuana. Morton did not know whether appellant "received any profit" from the sale but he received none in the officer's presence.

Appellant's version of what occurred follows generally the testimony of Morton except that he claimed he told Morton he did not have any grass and that Morton then asked him if he knew anyone from whom he could get some, to which appellant replied that he might "which was Ken Yeager." Appellant claimed also that Morton asked appellant to call Yeager. After the call Morton asked appellant to go over with him and he did so only because he was going to a party with Yeager. "I think we went over there five-thirty or so and the party started at seven, so I was going to go over there to the party." But on cross-examination it was elicited that he returned to his home with Morton and changed clothes. He said he had not received any proceeds of the sale although he admitted he knew that Yeager sold marijuana—"Yes, he has sold to other persons before but I've never been in a so-called ring with him before. I had nothing to do with that." He knew marijuana was called "grass" but that was Morton's term and he said he had only seen marijuana before "in books."

On this evidence the trial court in the Circuit Court for Montgomery County denied a motion for judgment of acquittal and the case went to the jury on a charge of conspiring with Ken Yeager on 24 October 1969 to sell marijuana to Davis W. Morton. The jury rendered a verdict of "guilty with mercy." [3] He was sentenced to 3 years, the sentence was suspended and he was placed

---

3. See Maryland Rule 758 e; *Sweeney v. State*, 6 Md. App. 431. The verdict of the jury does not appear in the transcript of the proceedings. The docket entries show: "Verdict—Defendant Guilty with Mercy."

on "supervised probation" for 3 years. On appeal he claims the lower court erred:

    I.   in denying his motion for judgment of acquittal because:

        (a)   the evidence was not sufficient to sustain the conviction;

        (b)   he was entrapped;

    II.   in instructing the jury;

    III.   with regard to jury challenges.

I

(a)

Taking the lead from *Snead v. State*, 234 Md. 63 at 66, citing *United States v. Prince*, 264 F. 2d 850 (3rd cir. 1959) as some authority for the proposition that a person cannot be convicted as a seller of narcotics if he acted only as agent for an officer in purchasing a drug from a third person, and see *Stewart v. State*, 232 Md. 318, 322,[4] appellant urges that although he admittedly participated in or facilitated the transaction, he was associated with the buyer, not the seller, and did not conspire to sell the narcotic, pointing out that it was not shown that he received any consideration from the transaction. He refers us to a line of cases decided by the Supreme Court of New York, Appellate Division, setting aside convictions of *selling* narcotics for the reason that "one who acts solely as the agent of the buyer cannot be convicted of selling narcotics."[5] The same rule was applied in upsetting the conviction of conspiring to sell and selling narcotics in *People v. Branch*, 213 N.Y.S.2d 535 (1961). But in each of those cases it appeared that the evidence was clear that the accused acted solely as agent for the buyer. In *Branch*

---

4. The contention in *Snead* and *Stewart* failed on the facts "if for no other reason."

5. *People v. Fortes*, 260 N.Y.S.2d 716 (1965); *People v. Lindsey*, 228 N.Y.S.2d 427 (1962); *People v. Buster*, 145 N.Y.S.2d 437 (1955).

the court said, at 535: "There is nothing in the evidence to show that the defendant had entered into a conspiracy with the vendor of the narcotics to engage in the selling of narcotics or that the defendant had acted in the transaction in any way as the agent of the vendor or on her behalf or that he was associated in any way with the enterprise of the vendor or that he had any personal or financial interest in bringing trade to her." The New York opinions were rendered in per curiam or memorandum form and baldly noted that the evidence was insufficient and stated the rule of law. Appellant relies heavily on *United States v. Moses*, 220 F. 2d 166 (3rd cir. 1955). In *Moses* the conviction of the sale of heroin was set aside on a finding that the accused was the agent of the buyer but the facts as set out in a full-blown opinion are readily distinguishable from the case before us. Marie Moses, 26 years of age and unmarried, was a drug addict. Two federal undercover agents had infiltrated into the circle of addicts and their familiars in which Marie moved. They went uninvited to her apartment, told her they wished to purchase drugs and inquired whether she knew where they could get them. She said she did not have any but one Cooper, her supplier, would be over in about a half an hour and she would be able to arrange for them to get drugs from him but that they might also be able to get drugs from another supplier named Mack. After waiting a while the agents told her to call Mack. She called his home but could not reach him. As the agents were about to leave, Cooper arrived. Marie introduced the agents to him and told him they wanted to buy drugs. Cooper asked if they were all right and when she replied in the affirmative asked her how she knew. She said she had seen them "over on the avenue" on other occasions. The agents told Cooper the amount and types of drugs they wanted and discussed the price with him. Marie took no part in this conversation. The agents and Cooper left the house and separated. Some hours later that evening they reas-

sembled at three different times and places. The money was paid at the second meeting and the drugs delivered at the third meeting. Marie was not present at any of these three meetings. There was no evidence either directly or by inference that Marie's relationship with Cooper was other than that of a customer. She merely introduced the prospective buyers to Cooper and vouched for them at their request, with the result that the agents accomplished a sale from Cooper some hours later. She was not charged with conspiracy nor with a crime in connection with the buying. The court found that under the law a participant in such a transaction must be punished either as a seller or a buyer and that there was no general offense of participation in the transaction viewed as a whole. See §§ 2553 and 2554 of Title 26 and § 2 of Title 18 United States Code. The government chose to indict her for her connection with the crime of selling and it is patent the evidence was insufficient to establish that crime. As in *Moses* so in *United States v. Sawyer*, 210 F. 2d 169 (3rd cir. 1954) where the need to identify the accused with the selling aspect of the transaction was pointed out. Following the rationale of the above cases and citing them as well as *Henderson v. United States*, 261 F. 2d 909 (5th cir.) and *Cofield v. United States*, 263 F. 2d 686 (9th cir.), cases of like tenor, is *Commonwealth v. Harvard*, 253 N.E.2d 346 (Mass. 1969), which, like the cases it relies on, is distinguishable from the instant case.

Appellant's version of the factual situation more closely follows that in *Moses* than does Morton's version. Appellant would have the jury believe that he told Morton he did not have any narcotics, that Morton asked if he knew where some could be obtained, that the call to Yeager was at Morton's request. But the jury did not have to believe appellant and according to Morton, appellant volunteered that he knew where to get marijuana and it was appellant's suggestion that he call the supplier known to him. It was appellant who conveyed

the price to Morton and asked if Morton desired to buy the quantity suggested by the supplier. It is not disputed that appellant accompanied Morton to Yeager's home, introduced Morton to Yeager, vouching for him, and was present when the sale was accomplished.

We do not have before us whether the evidence was sufficient to prove that appellant sold marijuana. He was convicted of conspiring with Yeager to sell marijuana to Morton and the question is whether the evidence was sufficient to establish conspiracy. We discussed the law of conspiracy in *Jones v. State*, 8 Md. App. 370, 375-378. We said that the gist of conspiracy is an unlawful combination and no further overt act is required to constitute the crime. Combination results from agreement and while there must be a meeting of the minds—a unity of design and purpose—to have an agreement, it need not be manifested by any formal words, written or spoken. It is enough if the parties tacitly come to an understanding in regard to the unlawful purpose, and this may be inferred from sufficiently significant circumstances. So a conspiracy may be shown by circumstantial evidence from which an inference of a common design may be drawn and it is not necessary to demonstrate that the conspirators met and agreed in terms to a design and to pursue it by common means. Concurrence of action on a material point is sufficient to enable the jury to presume concurrence of sentiment, and from this the actual fact of conspiracy may be inferred. Here the jury could have found from credible evidence before it that appellant at his own suggestion called Yeager and arranged for the sale of marijuana to Morton. This agreement between appellant and Yeager that the drug be sold to Morton resulted in the unlawful combination, as charged, to commit the crime proscribed by Code, Art. 27, § 277, then in effect, and the conspiracy was complete. Compare *Randolph v. State*, 10 Md. App. 89. Whether or not appellant thereafter shared in the profits or received some other consideration is not material. It may be, al-

though we need not so decide, that the receipt of some consideration is requisite to a sale, but it is not essential in a conspiracy to make an unlawful sale, the sale being an act to be accomplished *in futuro*. We hold that the lower court did not err in denying the motion for judgment of acquittal. *Williams v. State,* 5 Md. App. 450.

### (b)

We carefully reviewed the defense of entrapment in *Simmons v. State,* 8 Md. App. 355. We feel that on the evidence adduced, had the jury found that the officer induced appellant to commit the offense, it could have further properly found beyond a reasonable doubt that appellant's criminal conduct was due to his own readiness and not to the persuasion of the police. The question was properly for the jury. Therefore the court did not err in refusing to take the case from the jury on the principle of entrapment.[6]

### II

Appellant urges that the lower court erred in refusing to instruct the jury in accordance with certain of his specific requests relating to conspiracy and entrapment. As to conspiracy the court charged:

> "The defendant relies for his defense in this case on two theories: One is the theory that the State has failed to show a conspiracy, which is the offense charged, the only offense charged in this case.
>
> The defense says that the State has failed to show that the defendant profited in any way by this alleged transaction, and that he did not really conspire with the fellow named Ken Yeager but that he merely accommodated him,

---

6. We note that we said in *Simmons* that although the police induced the accused to commit the crime, "it does not necessarily follow that the State, to meet its burden of showing that the accused had a predisposition to commit the offense, *must* show that the police prior to the inducement, had a 'reasonable suspicion' that the accused was engaged in the commission of a crime or was about to be." 8 Md. App. at 362-363.

the police officer, and that there was no real association between the defendant and Yeager that established any conspiracy. There was no evidence of any collaboration or combination between the defendant and Yeager before or after this single alleged transaction.

The Court defines the offense of conspiracy as follows: The gist of the common law offense of conspiracy is the unlawful combination and agreement. The agreement may be to commit a crime or to accomplish an unlawful purpose, an overt act, but in neither case is an overt act necessary to the completion of the offense.

It is further stated that in Maryland the gist of a conspiracy is the entering into of the illegal scheme or design and once this occurs the crime is complete without the doing of an overt act.

Conspiracy may be shown by circumstantial evidence from which an inference of common design may be drawn. It not being vital to demonstrate that the conspirators met and agreed in terms to a set design and to pursue it by a common means.

Co-conspirators become responsible for acts committed in furtherance of the common scheme."

As to entrapment the court charged:

"The other theory on which the defendant relies as the Court understands it is the theory of entrapment, claiming that the defendant was entrapped, that he was induced into the commission of this offense, alleged offense.

If entrapment is proven it is a valid defense to a charge such as this.

To begin with I should point out to you that the function of law enforcement is the prevention of crime and the apprehension of criminals.

Criminal activity is such that artifices and strategy are necessary weapons in the arsenal of the police officer for in many cases this is the only way that evidence of the commission of a crime can be obtained.

If a police officer merely induces a defendant to do what the defendant was disposed to do anyway, there is no entrapment or to put it another way, if a police officer merely affords a defendant the opportunity to do what he was disposed to do anyway, there is no entrapment; but if the police officer implants in the mind of an innocent person the disposition to commit the alleged offense and induces the defendant to commit that offense in order that he may be prosecuted, then you do have entrapment.

On the question of entrapment, you may consider the evidence before you; that the police officer before he went to the defendant's home had received certain information concerning the defendant's alleged activities or alleged activities in the home of the defendant in which the defendant may have been involved, and that this information which the police officer allegedly received was regarded by the police officer according to him as reliable information.

You may consider this evidence because it bears upon the question of whether or not the police officer had reasonable suspicion to believe that the defendant was engaged or about to engage in the commission of an offense, and therefore bears ultimately on the question of whether the police officer did nor did not implant in the defendant's mind the disposition to commit an offense.

It, of course, would not be right for a police officer just to go up to anybody's door and ask if he had any grass to sell. He would have to

have some reason for going up. He would have to have as the law puts it reasonable suspicion.

It has been said that on the totality of the circumstances it is the burden of the State to show that the accused was ready and willing without persuasion and was awaiting any propitious opportunity to commit the offense."

We think, with regard to the applicable law, that the instructions given fairly covered the matters in the instructions requested. Rule 756 b; *Johnson v. State,* 9 Md. App. 166. We find no error in the refusal to grant the specific instructions to which appellant refers. We observe that it may be that appellant received more than that to which he was entitled with respect to the court's comments on "reasonable suspicion" in discussing the defense of entrapment. See note 6 *supra.*

### III

Appellant contends that the lower court erred "in permitting the State's Attorney to exercise peremptory challenges after eleven jurors had already been accepted by both the State and appellant using an alternating challenge procedure." For appellant to prevail we would have to depart from *Whittemore v. State,* 151 Md. 309 in which the Court of Appeals held at 316-320, under the authority of *Rogers v. State,* 89 Md. 424, that where the swearing of the jury is deferred until a full panel has been procured,[7] even jurymen who have been selected and accepted, and are seated in the jury box, may be challenged peremptorily, up to the time of swearing. And we would have to ignore the clear dictate of Rule 746 c which provides: "A peremptory challenge may be exercised as a matter of right until the time the jury is sworn." We do not do so.

*Judgment affirmed.*

---

7. Rule 747 now provides: "All members of a jury and alternate jurors, if any, shall be sworn at the same time."