GREGORY MARTIN AMOS *v.* STATE OF MARYLAND

[No. 975, September Term, 1978.]

*Decided April 20, 1979.*

The cause was argued before LOWE, MELVIN and LISS, JJ.

*John W. Sause, Jr., District Public Defender,* for appellant.

*Ray E. Stokes, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Donaldson C. Cole, Jr., State's Attorney for Cecil County,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

Gregory Martin Amos would have us reverse the judgment of the Circuit Court for Cecil County, wherein a jury convicted him of conspiracy to distribute methamphetamine. He provides us with alternative reasons: evidentiary insufficiency, and improper chain of custody of the controlled dangerous substance which he purportedly conspired to distribute.

— sufficiency of the evidence —

An undercover officer, Trooper Michael H. Pasker, testified to that which constituted the conspiracy:

"A We went into the house and met with Greg. And then we went up to his room which is located in the attic. We began a drug related conversation.

Q Just tell us what the conversation was between you and the Defendant? What did you talk about? What did you say and what did he say?

A He said, 'Do you have anything for your head?'

MR. EVANS [Defense Attorney]: I object. Who is this that says this?

THE WITNESS: Gregory.

MR. EVANS: Said what?

THE WITNESS: 'Do you have anything for your head?'

BY MR. COLE:

Q What happened next.

A I said 'No. That is what we are here to see you about.' And Gregory said he didn't have anything at that time, but if we came back or called him around 5:00 he would see what he could do for us.

Q He said come back or call?

A Around 5 that afternoon.

Q Did you do it?

A Yes. At about 5 that afternoon I returned to the house. Again with Dennis, we went into the house and into the kitchen. And Gregory said he didn't have

anything at that time, but he had talked to Ralph Quincy Richardson and that he had two quarter-tees of crank for sale, which means he had a quantity of methamphetamine for sale. And that he would meet us at the Howard Hotel in Elkton to make the transaction.

Q Did he say anything else?

A He also said that he would call at that time and tell him that we were on our way.

Q Okay. Now, did you go to the Howard Hotel?

A Yes, I did. I arrived there at approximately 5:30 and I met with Ralph Quincy Richardson at that location. I identified myself that I had just talked to Gregory Amos, and asked Richardson if Amos had contacted him, at which time he said, 'Yes, he did.'

. . .

A Richardson and I then went into the bathroom, at which time he said he had two quarter-tees of crank. And I asked him what the price would be. And he said $30 to me. I produced a $20 bill and a $10 bill and handed it to him, at which time he removed from his shirt pocket a silver cigarette case and had a pack of Kool cigarettes there. And on the side or in the bottom of the case he had two small packages of methamphetamine.

Q And they were — what happened to them?

A I then took them into my custody, and subsequently had them analyzed by a certified chemist for the State of Maryland."

While this evidence is admittedly thin, it is sufficient evidence from which a factfinder could infer a conspiracy. In *Kelley v. State,* 12 Md. App. 251 (1971), *cert. denied,* 263 Md. 716 (1971), the facts were surprisingly similar. There, a police officer testified:

" 'I said, 'Do you have any grass that you would like to sell?'

He said, 'My brother has some, but he's not home right now.' Then on top of that he said, 'But I know a guy that might have some. If you want to come in, I'll call him.' " *Kelley v. State,* 12 Md. App. at 253, n. 2.

Kelley then called the source, relayed the messages and went with the officer to vouch for him. The transaction was consummated, and as here, no evidence was adduced that Kelley participated in the proceeds. This Court held that:

> "the jury could have found from credible evidence before it that appellant at his own suggestion called Yeager and arranged for the sale of marijuana to Morton. This agreement between appellant and Yeager that the drug be sold to Morton resulted in the unlawful combination, as charged, to commit the crime proscribed by Code, Art. 27, § 277, then in effect, and the conspiracy was complete. Compare *Randolph v. State,* 10 Md. App. 89. Whether or not appellant thereafter shared in the profits or received some other consideration is not material." *Id.* at 258.

Appellant seeks to distinguish *Kelley* because of his limited participation in the actual transaction. He contends that he did little more than give gratuitous advice to the trooper at the trooper's importunacy, *i.e.,* he made inquiries solely on behalf of the trooper. But that is his interpretation of the facts proven without allowance for logical inferences which may flow from those facts. If jurors could not infer elements of dishonesty from borderline conduct, few, if any, conspiracy convictions would occur. *Id.* at 257-258. The difficulty, of course, is that the law of conspiracy is broad enough to ensnare innocent acts shaded with corrupt appearances.

Over one hundred and fifty years ago the Court of Appeals decided that every conspiracy to do an unlawful act, or to do a lawful act for an illegal purpose which has a tendency to prejudice the public, is at common law an indictable offense. *State v. Buchanan,* 5 H. & J. 317 (1821). If the evidence in the

case at bar is considered thin, it appears abundant when compared to some of the examples given in *Buchanan, e.g.:*

> "So in *The King* vs. *Leigh and others, (Macklin's Case,)* 2 *Macklin's Life,* 217, in which it was held, that an indictment would lie for a conspiracy to impoverish an actor, by driving or hissing him off the stage; and in *Clifford* vs. *Brandon,* 2 *Campb.* 358, it was said by Sir James Mansfield, that 'though the audience had a right to express by applause or hisses their sensations at the moment, yet if a body of men were to go to the theatre, with a settled intention of hissing an actor, or even of damning a piece, there could be no doubt that such a deliberate preconcerted scheme would amount to a conspiracy, and that the persons concerned in it might be brought to punishment.' There the preconcerted scheme alone, the unexecuted conspiracy, was held to be indictable; but if put into execution, according to circumstances, it would be a riot." *Id.* at 346-347.

We will, therefore, not reverse without retrial, because the evidence was sufficient to have sustained the verdict. However, finding evidentiary error of a prejudicial nature, we will reverse and remand for retrial. *State v. Boone,* 284 Md. 1, 13-14 (1978); *Mackall v. State,* 283 Md. 100 (1978).

— chain of custody —

If appellant were to be convicted of conspiracy to distribute a quantity of methamphetamine, a controlled dangerous substance, as charged, the proof must equal the charge. The testimony set forth above — without more — would have been sufficient. The actual transaction conspired need not have transpired. Execution is not requisite, *Buchanan, supra* at 355; the gist of the conspiracy is an unlawful combination and no further overt act is required to constitute the crime. *Kelley, supra; Jones v. State,* 8 Md. App. 370, 375-378 (1969).

But, presumably, because the evidence was inferentially equivocal, the State chose to bolster it by showing the

consummation of the overt act conspired. To further substantiate the testimony that the sale took place as set up by appellant, the State sought to introduce the methamphetamine purchased by the officer, then to prove by a chemical analyst that it was indeed methamphetamine. In short, the State sought to corroborate the testimony of the trooper and to enlarge the scope of inferential culpability by introducing the real evidence of the crime appellant had conspired to have perpetrated, *i.e.,* by presenting to the jury the controlled dangerous substance itself.

To be admissible, however, this "real evidence" must be in substantially the same condition that it was in at the time of the crime and must be properly identified. 3 *Wharton's Criminal Evidence* § 635 (13th ed. C. Torcia). Although there is a natural inference or presumption of continuance in the same condition, that inference varies in each case with the nature of the subject matter and the time element. *Nixon v. State,* 204 Md. 475, 482 (1954); 2 Wigmore, *Evidence* § 437 (1) (3d ed.).

Whether real evidence is in the same condition as at the time of the crime so as to permit admissibility is not entirely a discretionary matter with the court, *Nixon, supra* at 483; although the circumstances surrounding its safekeeping in that condition in the interim need only be proven as a reasonable probability. *Breeding v. State,* 220 Md. 193, 199 (1959). The proof negating the probability of changed conditions between the crime and the trial, is spoken of as proving the chain of custody, and in most instances is established by accounting for custody of the evidence by responsible parties who can negate a possibility of "tampering" and thus preclude a likelihood that the thing's condition has changed.

In a narcotics' case, the heart of the crime is that the seized evidence is legally proscribed, and this of necessity requires expert analysis of the thing seized. Obviously, the identifying guarantee that the hard evidence seized is unchanged between the time of seizure and the trial is not as important as establishing that the thing seized is the same analyzed and introduced at the trial as a proscribed drug. When drugs are

submitted to police laboratories for analysis, and held in drug lockers with "say two hundred [other specimens] to be tested," there is far greater risk of misidentification than there is of changed conditions. It is the assurance that the substance analyzed and introduced was the same substance purchased by Trooper Pasker that appellant contends was not established with even "reasonable probability" in this case. The State attempted to negative the possibility of mistake by establishing a "chain of custody" but it fell short of connecting the links.

Trooper Pasker testified that after purchasing the drug in two small packets, he locked them in a brief case which was locked in his car trunk until the next day when he delivered them personally to the chemist, a M. Patricia Sullivan:

"Q  All right. Now, when did you — you took them into your custody and when did you deliver them to the chemist?

A  I would like to look at the lab report here.

Q  Go ahead.

A  I delivered them to M. Patricia Sullivan, Certified Chemist for the State of Maryland, on the 21st, the day following, at 1:40 P.M."

As further explained, he pointed out that the two packets were sealed in an orange evidence envelope which he identified as being the one he turned over to Ms. Sullivan:

"Q  I show you State's 1 for identification. Can you identify it?

A  Yes, I can.

Q  Will you please do so?

A  This is the envelope in which I placed the two packages of methamphetamine.

Q  Are they still in it or —

A  They are still in here, and it is sealed by the official seal.

Q  Of the chemist?

A  Of the Criminal Laboratory of the Maryland State Police.

> Q Okay. And you delivered that particular package with its contents to Miss Sullivan at 1:40 P.M. on the 21st?
>
> A Yes."

On cross-examination he repeated his procedure.

> "Until the next day when I went to Headquarters. Then I took my — I unlocked the trunk and took my case out and went into the office, and unlocked the briefcase. I got one of these orange evidence envelopes, placed the stuff in there and filled out all of the information, and I sealed the envelope myself. I then carried it personally to the Maryland State Police Laboratory Services Section where it was turned over to Mary Patricia Sullivan."

But when pressed for proof of this transfer to Ms. Sullivan, the officer first waffled:

> "Q I am not talking about the Court. You say you gave something to somebody. Who did you give the stuff to?
>
> A To M. Patricia Sullivan, the Certified Chemist for the State of Maryland.
>
> Q All right.
>
> A It was stamped on there at the time.
>
> Q Did M. Patricia Sullivan give you a receipt for what you gave her?
>
> A She stamped this and I also had another receipt.
>
> Q All right. Well, the best evidence would be the other receipt. Where is it?
>
> A I suppose that it is in my desk in Pikesville or —
>
> Q Why wouldn't it be in the file in this case?
>
> A Through my own neglect.
>
> Q And what this is is just a time stamp, just received in the Crime Lab. Does this say who it is received by?

A Yes. It is also signed by the chemist below my name, indicating the chain of custody.

Q Well, that is what it is signed. But I am not interested — anybody could sign anything. I am asking you: You gave it to this girl?

A She will be in to testify.

Q Answer my question. It is not what she will be. I asked you. You gave it to this girl and she signed for it, is that correct?

A Yes, sir.

Q All right. But you didn't get this — this is just a chain of custody. And then I suppose she gave it back to you later, huh? Did you actually hand it to this one girl?

A We have a procedure.",

then abruptly changed his story:

"Q Just answer my question and then you can say anything you want to say about your procedure. I asked you: Did you actually deliver, hand deliver it to this Sullivan woman or girl? Just answer yes or no.

A No.

Q No. And when it came back to you, did she personally hand deliver it to you?

A Yes, she did.

Q But you didn't hand deliver it to her?

A No.

Q You don't know whose hands it went in or where it went after you put it there? Who did you give it to?

A Trooper First Class Howard Presnell.

Q Where is he?

A He is assigned to the Laboratory Services Section.

Q Well, he is not here today, is he?

A I don't think so.

Q I mean you would know whether he came up.

So, this thing, you don't really know where it went between the time it left your hands, when you gave it to Trooper Presnell, is that correct?

A Presnell —

Q So you didn't really deliver it to the Lab at all, you gave it to Trooper Presnell?

A I delivered it to the Lab.

Q But you gave it to somebody named Presnell, right?

A Yes.

Q And Presnell is not here to say what he did with it."

Since the only purpose of a chain of custody is to verify that the evidence is the same obtained at the time of the crime, appellant called upon the officer to describe what he had purchased.

"Q Is there any way, other than what you have told us, that these are not pills, but some sort of a powder, is that correct? It is a powder substance, is that what it is?

A Yes, sir.

Q All right. What color is it?

A It is off-white, like Coffee Mate.

Q An aspirin is sort of off-white, isn't it?

A No, I would say that is pure white.

Q But there are a lot of known CDS?

A Really like Coffee Mate. That is almost the exact color.

Q So, you got it back. Now, how do you know if this is a powder — that the same powder you got back is what you turned in? Is there any way you can tell it other than you say it was in the envelope?

A The chemist who will testify later can.

Q We don't want you to testify what the chemist

will testify to. How many chemists are down in this lab?"

Appellant's obvious concern came from the fact that he had unsuccessfully tried doggedly to have the trooper open the sealed envelope and identify the contents as being the same which he had placed therein for analysis:

"Q You should have shown it to us. Why don't we take a look at it. Do you have it here?

A It was submitted into evidence. Yes, here it is.

Q I haven't seen it. And we have an envelope, but there might be nothing in it.

MR. COLE: It will be opened when the chemist gets here, Billy.

MR. EVANS: I want to see what it is now, and see if there is anything in there.

MR. COLE: I don't know what is in there.

MR. EVANS: Maybe there is nothing.

MR. COLE: It could be.

BY MR. EVANS:

Q Did you see anything in there?

A There is something in there.

MR. EVANS: Let's open it. Do you want me to open it, if you are afraid to open it?

MR. COLE: Judge, what will this do about our chain is the only problem I am running into.

THE COURT: Do you propose to open it, Mr. Cole?

MR. COLE: The chemist will open it.

THE COURT: What is in there, two white packets of white powder.

MR. EVANS: I want to see if there is anything in it at this time. The Jury is here and —

THE COURT: The Jury will still be here.

MR. EVANS: I understand that. And I think I have a right to have it opened at this time.

THE COURT: Well, you can call this Witness back and question him after it is opened, if you wish, as a State's Witness.

MR. EVANS: Your Honor, there is no way —

THE COURT: It isn't necessary that the Defense Counsel have everything that he wants, nor is it right.

MR. COLE: We plan to open it with the chemist.

MR. EVANS: If you can direct me to anything in the law that says that a piece of evidence that I can't ask to have it opened.

THE COURT: It isn't even in evidence.

MR. EVANS: Excuse me. If you had said that, I would concede. The envelope is identified. The contents of the envelope have not been identified.

THE COURT: The envelope is in for identification, Mr. Evans.

MR. EVANS: The envelope is and the contents?

THE COURT: And contents.

MR. COLE: That comes later.

MR. EVANS: Then we can't see the contents. How can it be identified? It is very simple.

THE COURT: The envelope contains contents, Mr. Evans, and it is in for identification.

MR. COLE: That is as far as we have gone so far.

MR. EVANS: Well, we are sort of bandying words. But I think if the envelope is in, the contents you say are in, and we ought to see them.

THE COURT: They aren't in, sir, except for identification. You, as a lawyer, know the difference between identification and evidence.

MR. EVANS: You tell me what I know as a lawyer, and sometimes you and I don't agree.

THE COURT: That is very often the case, particularly when you are trying a criminal case and I am sitting here as a Judge.

MR. EVANS: You have the upper hand.

THE COURT: I don't have the upper hand, Mr. Evans."

The judge was in error. He did have the upper hand, and he did deny the identification. The purpose of marking an exhibit for identification is so it may be identified, since its admissibility has not been adequately established. As appellant rhetorically asked, if a witness is not allowed to see the contents, "[h]ow can it be identified?" Had the trooper been permitted to view the contents, that would have been some measure of assurance that the evidence he had given to someone, but gotten back from Ms. Sullivan prior to trial, was the same he had purchased from Richardson. If there is an inference that the evidence obtained at the crime is the same analyzed and introduced (as there is an inference that such evidence's condition remains the same), that inference has been dispelled by the trooper's equivocation and the refusal to let him identify the substance.

Attempting to overcome this difficulty the State introduced, over objection, the chain of custody report. That report contradicted the officer's most recent testimony that he had delivered the evidence to an Officer Presnell, but reestablished that he had delivered it to, and received it back from, Ms. Sullivan.

"EVIDENCE TAKEN INTO CUSTODY BY:
Tfc Michael H. Pasker #2487 10-20-77    5:35 PM
    M. Patricia Sullivan   10-21-77            140 PM
Tfc Michael H. Pasker #2487 11-17-77 1052 AM"

The court admitted the log but recognized its limited value:

"Mr. Evans, I know it is in contradiction. I know that. But that doesn't make this piece of paper

inadmissible. He is telling you where he signed that he gave it to Sullivan and he got it back from Sullivan. Now, I realize he told us that he gave it to Presnell. So does the Jury. And it doesn't make it inadmissible."

Finally Ms. Sullivan was placed on the stand to clear up the dilemma of whether Trooper Pasker had delivered the evidence directly to her or to Trooper Presnell. Ironically, although the envelope was still only identified and not admitted, *she* was allowed to open the envelope and describe its contents, but that, of course, did not serve to guarantee that what she had received was that which Pasker had purchased.

"Q O.K. Now, will you open the envelope and tell us what's inside?

MR. COLE: Sounds like an Oscar award, find out what's inside the envelope. I don't even know.

MR. EVANS: Be surprised if there's nothing in there, too, won't you?

MR. COLE: You're darn right. I'll be the first to yell, 'Surprise.'

BY MR. COLE:

A O.K.

Q Found something, another envelope?

A It contains a manila envelope initialed by me, and two plastic packets.

Q O.K. Could you see it's plastic? They're quite small, aren't they?

A Uh-huh."

But finally the big moment: from whom did Ms. Sullivan obtain the evidence, Trooper Pasker or Presnell? The answer — a new development — neither one.

"Q O.K. O.K. Now, you received this envelope containing the packets when, again, the lab really received it?

A  The lab received it on the 27th of October.

Q  And when did you pick it up and make your test?

A  Well, I picked it up at the front desk when it came in. I didn't analyze it until the 1st of November.

Q  Who did you get it from?    Do you remember who was on the front desk?

A  Let's see —

Q  If you can remember?

A  Well, since it's initialed on the front, it was originally accepted in by Jay Tobin.

Q  Yeah, and who was there? Tobin is your Chief. Is that correct?

A  Yeah.

Q  He gave it to who?

A  He gave it to me.

Q  O.K. Now, who would be the police officer who received it first, if you know?

A  No. He would have received it first. Apparently there was nobody else out at the front desk at the time."

But even before appellant could cross-examine her, the evidence was admitted, over an objection based upon improper chain of custody.

"THE COURT: The question is whether the chain of custody is probably accurate and doesn't have to be precise. That's why I was asking that question.

MR. EVANS: I object to it for the record.

THE COURT: I note your objection and it may be well-taken, Mr. Evans. I don't know. You have other objection beside chain of custody?

MR. EVANS: Well, I don't know at this time whether — as to the admission? I only have, we've got, the State's put on two witnesses, both testified, diametrically opposed.

THE COURT: This concerns chain of custody. I'm asking if there's anything else?

MR. EVANS: Not at this time, and I think that's critical of it.

THE COURT: All right. I'll overrule your objection. Mark it in evidence."

Despite that setback, the appellant persisted, but Ms. Sullivan, unlike the trooper, stood by her recollection:

"Q Miss Sullivan, you'll have to educate us, I guess, a little bit on chemistry and things, and also the further handling of this particular item. You've told us that it was delivered to you by Mr. J. O. Tobin, who is the head chemist down there. Is that correct?

A It was delivered to me at the front desk, yes. It was probably by Jay Tobin. The only reason I mentioned him is because he has initialed the blue sheet, which means that he accepted it in.

Q Did Officer Presnell initial, do his initials appear on that sheet?

A No, they don't.

Q Not at all?

A No.

Q Well, if he'd handled it, it should've had his initials on there, shouldn't it?

A It probably would.

Q Well, is there ever any mix-up in this down there?

A No. They're usually not put on chain of custody because they don't actually do anything with the evidence but process it in and send it back.

Q That's all Mr. Tobin did in this case, was process it in while you think Presnell was out to lunch. That's your conjecture, isn't it?

A All I'm saying is that Jay processed it in. Where Trooper Presnell is is —

Q O.K. All right. And then he delivered it to you while he was still at the front desk?

A Yes.

Q And you took it where?

A Back into the drug locker.

Q All right. And how many specimens would be in the drug locker at any one time?

A Let's see, approximately, I would say two hundred to be tested."

The confusion was at least partially attributable to the intermittent interweaving of the testimony, during the course of trial, in front of the jury. That fact does not alter the failure of the State to identify or even to link inferentially the evidence sought to be admitted to that obtained as a result of the sale set up by appellant. This failure, of course, affected the very relevance of the chemist's testimony, and while its absence would not have affected the minimal sufficiency of a conspiracy conviction, it had such obvious persuasive effect that its admissibility cannot be said to be harmless beyond a reasonable doubt. *Dorsey v. State,* 276 Md. 638, 659 (1976).

Although for purposes of admissibility the chain of custody authentication of evidence need not be beyond a reasonable doubt, it must create a reasonable probability of sameness, just as in a like instance it must preclude by reasonable probability, any tampering. The evidence here was never identified as being the same or similar to that obtained by Trooper Pasker, and instead of supporting an inference of sameness, the State threw out four conflicting possibilities in a multiple choice evidentiary game for judge and jury to choose from. The procedure either went

from Pasker to Sullivan; or,

from Pasker to Presnell to Sullivan; or,

from Pasker to Tobin to Sullivan; or,

from Pasker to Presnell to Tobin to Sullivan,

and in any of the four, the State would have its inference of sameness supported. But in the absence of both Presnell and Tobin, the only thing reasonably probable was that whatever Ms. Sullivan analyzed *she* obtained from Tobin and returned to Pasker. Between Pasker and Sullivan there is far too much

speculative possibility without the testimony of Presnell or Tobin to establish its identity.

The remaining pro se issues were reviewed and found to be without merit.

> *Judgment reversed and case remanded for retrial.*
> *Costs to be paid by Cecil County.*