533 A.2d 1

**Mitchell Mickey MOORE**

v.

**STATE of Maryland.**

**No. 253, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

Nov. 10, 1987.
Certiorari Denied Feb. 24, 1988.

**38**

Martin H. Freeman, Bethesda (Alan H. Murrell, Public Defender and Isaac S. Kershner, Assigned Public Defender, Baltimore, on the brief), for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, Andrew L. Sonner, State's Atty. for Montgomery County and Robert L. Dean, Asst. State's Atty. for Montgomery County, Rockville, on the brief), for appellee.

Argued before WILNER, ALPERT and WENNER, JJ.

WILNER, Judge.

Someone entered Marie Workman's Silver Spring apartment in the early afternoon of October 12, 1984 and raped her, killed her, and stole her jewelry and other valuables. A jury in the Circuit Court for Montgomery County concluded that appellant was the culprit; it convicted him of first degree murder, first degree rape, robbery with a deadly weapon, and statutory housebreaking. From the judgment entered on those convictions, appellant has brought this appeal, complaining that the court erred

(1) in admitting evidence of other crimes;

(2) in admitting into evidence a bus transfer found at the Workman apartment without requiring proof of a chain of custody of the transfer;

(3) in denying appellant's motion to suppress certain evidence arising from an illegal arrest; and

(4) in denying certain jury instructions requested by him.

We find no reversible error and shall therefore affirm.

### (1) *Other Crimes Evidence*

Proof of appellant's criminal agency was entirely circumstantial. No one saw him enter or leave Ms. Workman's apartment; nor, except for a bus transfer, was any physical evidence found at the site to connect him to the crimes. In an effort to show that he was the assailant, the State offered evidence that he had gained entry to the apartments of two other women in the same distinctive manner that the State theorized the assailant gained entry to the Workman apartment and that he attacked those two other women in much the same manner that Ms. Workman was attacked. Appellant's first complaint is to the admission of that evidence.

The State acknowledges the general rule that, "in a prosecution for a particular crime, evidence which in any manner shows or tends to show that the accused has committed another crime wholly independent of that for which he is on trial, even though it be a crime of the same type, is irrelevant and inadmissible." *Ross v. State*, 276

Md. 664, 669, 350 A.2d 680 (1976). It supports the admission of the "other crimes" evidence here on the basis that it establishes a particular *modus operandi* —a "distinctive handiwork" or "signature"—which, either on its own or as an indication of the identity of the perpetrator of the instant offenses, constitutes one of the recognized exceptions to the general rule. *See Cross v. State*, 282 Md. 468, 477–78 (n. 6), 386 A.2d 757 (1978).

The State sought to prove that (1) on September 28, 1984, appellant gained entry to the Silver Spring apartment of Lisa White, where he assaulted, raped, and robbed Ms. White and (2) on October 15, 1984, he gained entry to the District of Columbia home of Sharon Breed, where he assaulted and robbed Ms. Breed. Evidence as to those crimes came from testimony of the two victims, testimony of one Larry Boddie, and from certain physical evidence recovered from appellant upon his arrest. Appellant does not dispute that the evidence adduced by the State sufficed to show that he committed those two other crimes; nor does he contest the State's need for that "other crimes" evidence to establish criminal agency in the instant case. The area of dispute is whether the "other crimes" evidence adduced by the State established a sufficiently "distinctive handiwork" or "signature" to warrant admission under this exception.

The "handiwork" or "signature" exception to the general rule excluding "other crimes" evidence was mentioned by the Court of Appeals in *Ross v. State, supra*, 276 Md. 664, 350 A.2d 680, *McKnight v. State*, 280 Md. 604, 375 A.2d 551 (1977), and *Cross v. State, supra*, 282 Md. 468, 386 A.2d 757. In each of those cases, the Court cited, with apparent approval, *McCormick on Evidence* § 190, wherein the exclusionary rule and its multiple exceptions are discussed in some detail. *See also Straughn v. State*, 297 Md. 329, 333–34, 465 A.2d 1166 (1983); *State v. Werner*, 302 Md. 550, 489 A.2d 1119 (1985). The particular exception at issue here is described in § 190(3); McCormick there states that evidence of "other crimes" may be admitted:

"To prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused. Here much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. *The device used must be so unusual and distinctive as to be like a signature.*"

(Emphasis added.) *See also Brafman v. State,* 38 Md.App. 465, 381 A.2d 687 (1978).

In support of that statement, McCormick cites *People v. Haston,* 69 Cal.2d 233, 70 Cal.Rptr. 419, 444 P.2d 91 (1968), where the California Supreme Court discussed the exception at even greater length. Of particular interest is the language, 70 Cal.Rptr. at 427–228, 444 P.2d at 99–100:

" 'Several decisions have held that the test of admissibility of evidence of another offense offered to prove common design, plan, or *modus operandi* is whether there is some clear connection between that offense and the one charged so that it may be logically inferred that if defendant is guilty of one he must be guilty of the other.' [citation omitted.] It is apparent that the indicated inference does not arise, however, from the mere fact that the charged and uncharged offenses share certain marks of similarity, for it may be that the marks in question are of such common occurrence that they are shared not only by the charged crime and defendant's prior offenses, but also by numerous other crimes committed by persons other than defendant. On the other hand, the inference need not depend upon one or more unique or nearly unique features common to the charged and uncharged offenses, for features of substantial but lesser distinctiveness, although insufficient to raise the inference if considered separately, may yield a distinctive combination if considered together. *Thus it may be said that the inference of identity arises when the marks common to the charged and uncharged offenses, considered singly or in combination, logically operate to set the charged and uncharged offenses apart from other crimes of the*

*same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses."*

(Footnotes omitted; emphasis added.)

In articulating this view, the California Court was careful to point out that each of the "marks" must have some element of distinctiveness—that "The sum of zeroes is always zero. Thus, it would seem that the distinctiveness of the common marks offered must always be a factor for consideration whether such marks are taken singly or in combination." *Id.,* 70 Cal.Rptr. at 428 n. 15, 444 P.2d at 100 n. 15.

The State proffers 10 common "marks" or similarities between the White and Breed episodes, on the one hand, and the instant case, on the other:

(1) The distinctive method by which the assailant gained entry into the victim's apartment (of which we shall say more);

(2) The time span: the White incident occurred two weeks before the Workman crime; the Breed incident occurred three days afterward;

(3) All three crimes occurred between 11:45 a.m. and 1:30 p.m.;

(4) All three victims were women who suffered extensive injury to the face and neck;

(5) In all three cases, the assailant demanded or took jewelry and the contents of the victim's purse;

(6) In the White and Workman episodes, the weapon used was a kitchen knife;

(7) In the Breed and Workman episodes, a ligature was employed;

(8) Ms. White was raped in her bedroom; there was evidence that Ms. Workman also was raped in her bedroom; and the evidence in the Breed case lent an inference that Ms. Breed would have been raped had the assailant not

noticed the telephone off the hook during the course of his assault;

(9) Both Ms. Breed and Ms. White were choked until unconscious and subsequently beaten in the face; and

(10) All three incidents occurred near a station on the Washington metro system.

The State's principal reliance is on the first "mark." The evidence as to that was essentially as follows.

Sharon Breed testified that appellant knocked on her door and asked if one Larry Hardin lived there. She told him that he did not but, at appellant's request, obtained Hardin's address from the telephone book. She informed appellant that Hardin's address was in a different neighborhood, whereupon appellant showed her, from his wallet, what appeared to be a family photograph of a man, woman, and child, represented that the man was Mr. Hardin, and asked if she knew him. She replied in the negative and closed the door. Appellant then asked if she could draw a map to Hardin's address; when she opened the door to do so, he grabbed her around the neck and burst into her home. Ms. Breed identified a photograph of a man, woman, and small child found in appellant's wallet at the time of his arrest as the photograph appellant showed her prior to the attack.

Ms. White said that appellant came to her door looking for a friend named Rick. He showed her a photograph from his wallet, also of a man, woman, and child. When she told him to try the gas station, he burst into her apartment and grabbed her by the throat.

There was no direct evidence as to how the assailant got into Ms. Workman's apartment. Mary Chapdelaine, a neighbor living in the next apartment building, testified that, at about 11:30 on the morning of October 12—i.e., within two hours of the time Ms. Workman was killed—a man whom she ultimately identified at a lineup as appellant came to her door, showed her a family photograph from his wallet, and asked if she knew the people depicted in the photograph. Just at that point, her immediate neighbor

opened the door and the man left. Ms. Chapdelaine said that the photograph found in appellant's wallet was "similar" to the one shown her at the time.

The State's position is based on the inference from Ms. Chapdelaine's testimony that appellant was on the scene at or near the time of the murder and that he used the same artifice—displaying a family photograph and engaging the victim in nonthreatening conversation—as a prelude to breaking into the home. This, it maintains, is the distinctive "signature" which, together with the other points of similarity, permits the use of the "other crimes" evidence. The inference is supported, says the State, by the absence of any evidence of a forced break-in of the Workman apartment. Appellant dismisses the inference as unavailing; he stresses the fact that there is no direct evidence of how the intruder got into the Workman apartment and thus contends that the State failed to show the requisite link between the Breed and White episodes and the one at bar.

■ Before discussing the merits of this issue, we think it may be helpful to set out the framework for our review. Some courts have regarded the admission of "other crimes" evidence as involving an element of discretion which an appellate court would review on an abuse of discretion standard. As McCormick points out, however, that is an oversimplified view. There is no discretion "to depart from the principle that evidence of other crimes, having no substantial relevancy except to ground the inference that [the] accused is a bad man and hence probably committed this crime, must be excluded." *Id.*, § 190, p. 453.

■ For the evidence even to qualify for admission, it must fall within one of the exceptions that the court has recognized or would be willing to recognize as having an independent relevance and, although, because this is largely a factual question, it will ultimately depend on how the last appellate court to review the case happens to view the matter, it is not a discretionary ruling. The element of discretion arises only when the evidence *does* fall within a

permissible exception and is thus *prima facie* admissible. It is then that the court must balance the independent relevance against the danger of undue prejudice and decide whether to exclude the evidence notwithstanding its facial admissibility. *That* is the discretionary decision—to *ex* clude otherwise admissible evidence, not to *in* clude otherwise inadmissible evidence.

■ The issue before us is whether the evidence even qualifies for admission, whether it suffices to show the required "signature." We believe that it does. In reaching that conclusion, we first consider, and reject, the notion, proffered without benefit of either supporting precedent or logical compulsion, that the manner of entry into the Workman apartment could not be established by inference. There are few facts, including even ultimate facts, that cannot be established by inference. As Judge Moylan pointed out for the Court in *Evans v. State*, 28 Md.App. 640, 702–03, 349 A.2d 300 (1975), *aff'd* 278 Md. 197, 362 A.2d 629 (1976):

"In a real sense, the whole decision-making process is the process of drawing inferences. From fact A, we infer fact B. From a confession, we infer guilt. From the pulling of a trigger, we infer an intent to harm. From the possession of recently stolen goods, we infer the theft. From the motive, we infer the criminal agency. From the presence of the sperm, we infer the penetration. From the muddy footprints on the living room rug, we infer the unlawful entry. The whole phenomenon of circumstantial evidence is the phenomenon of inferring facts in issue from facts established."

■ There is nothing so special or peculiar about the manner of entry as to preclude proof by inference. The apartment was on the top (third) floor; according to Mr. Workman, there was but one entranceway. It was established that there were no signs of forcible entry—no broken windows or doors, no pry marks. From that, a fair inference may be drawn that Ms. Workman, who was in the

apartment babysitting with her daughter and three other young children, opened the door voluntarily, in response to a knock.[1] Ms. Chapdelaine's testimony not only put appellant on the scene near the time of the entry but allows the inference proffered by the State—that the intruder used the same method of encounter as had been used by appellant in the Breed and White incidents.

■ We turn, then, to whether, with that inference, the similarities suffice to establish the requisite "signature." Because of the very uniqueness required by this exception, identical cases are virtually impossible to find; each case will generally have to be determined on its own facts, the polestar being essentially that articulated in *People v. Haston, supra:* do the "marks," considered singly or in combination "logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses?"

There are many, many reported appellate decisions discussing and applying this principle in sexual assault cases, perhaps because that kind of crime seems more likely than most others to lend itself to peculiar, distinctive traits. Whether as a matter of conscious policy or just by happenstance, the courts have been quite liberal in allowing, under the "signature" exception, evidence of other sexual assaults committed by the defendant upon a showing of reasonable similarity in such things as the method or circumstances of the initial encounter, inducements offered to lure the victim to the place of assault, the nature of the assault itself, whether and what weapons were used, whether and how the victim was otherwise abused, and where and when the

---

1. That is not a required inference, of course, nor the only permissible one. A neighbor testified to having seen Ms. Workman leave the apartment with the children an hour or so before Ms. Workman was killed. As appellant suggests, it is possible that the killer simply accosted her and followed her into the apartment when she returned. That possibility does not preclude the more inculpatory inference, however.

attack occurred.[2] Indeed, one finds in reading some of these cases that the degree of similarity or distinctiveness is often not so great.

The *McKnight* Court, 280 Md. 604, 614, 375 A.2d 551, found insufficient similarities in four street "yokings" to permit a joint trial, concluding that "yokings" of older victims walking alone in secluded areas "are not uncommon in an urban milieu." Interestingly, it cited in support two robbery cases but noted, in distinction, a sexual assault case (*Arnold v. United States*, 358 A.2d 335, 338–39 (D.C.1976)) where "other crimes" evidence was allowed under the "signature" exception.

It is not necessary for us to consider whether a different, more liberal rule should apply in sexual assault cases. We

---

2. *See, for example, Crisafi v. United States*, 383 A.2d 1 (D.C.), *cert. denied* 439 U.S. 931, 99 S.Ct. 322, 58 L.Ed.2d 326, *reh'g denied* 439 U.S. 1058, 99 S.Ct. 738, 58 L.Ed.2d 716 (1978); *People v. Beam*, 57 N.Y.2d 241, 455 N.Y.S.2d 575, 441 N.E.2d 1093 (1982); *Primm v. State*, 473 So.2d 1149 (Ala.Cr.App.1985); *State v. Roscoe*, 145 Ariz. 212, 700 P.2d 1312 (1984); *State v. Ashelman*, 137 Ariz. 471, 671 P.2d 912 (App. 1983); *People v. Huber*, 181 Cal.App.3d 601, 227 Cal.Rptr. 113 (1986); *People v. Scott*, 218 Cal.App.2d 249, 32 Cal.Rptr. 225 (1963); *State v. Howard*, 187 Conn. 681, 447 A.2d 1167 (1982); *Mason v. State*, 438 So.2d 374 (Fla.1983), *cert. denied* 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984); *Echols v. State*, 149 Ga.App. 620, 255 S.E.2d 92 (1979); *People v. Houseton*, 141 Ill.App.3d 987, 96 Ill.Dec. 149, 490 N.E.2d 1354 (1986); *People v. Watson*, 98 Ill.App.3d 296, 53 Ill.Dec. 694, 424 N.E.2d 329 (1981); *Baker v. State*, 449 N.E.2d 1085 (Ind. 1983); *State v. Newman*, 326 N.W.2d 796 (Iowa 1982); *State v. Breazeale*, 238 Kan. 714, 714 P.2d 1356 *cert. denied* — U.S. ——, 107 S.Ct. 164, 93 L.Ed.2d 102 (1986); *State v. Hanks*, 236 Kan. 524, 694 P.2d 407 (1985); *State v. Moore*, 440 So.2d 134 (La.1983); *Com. v. Madyun*, 17 Mass.App. 965, 458 N.E.2d 745 (1983); *People v. Humble*, 108 Mich.App. 777, 310 N.W.2d 878 (1981); *People v. Baker*, 103 Mich.App. 704, 304 N.W.2d 262 (1981); *State v. Thomas*, 310 N.C. 369, 312 S.E.2d 458 (1984); *State v. Fisher*, 670 S.W.2d 232 (Tenn.Cr.App. 1983); *Lewis v. State*, 674 S.W.2d 423 (Tex.App.1984); and *cf. State v. Ture*, 353 N.W.2d 502 (Minn.1984). See also *Jones v. State*, 460 So.2d 1384 (Ala.Cr.App.1984), *State v. Harding*, 141 Ariz. 492, 687 P.2d 1247 (1984), and *People v. McCarty*, 164 Cal.App.2d 322, 330 P.2d 484 (1958), applying the exception in robbery cases, and *Artis v. United States*, 505 A.2d 52 (D.C.), *cert. denied* — U.S. ——, 107 S.Ct. 464, 93 L.Ed.2d 409 (1986), and *People v. Herrara*, 633 P.2d 1091 (Cal.App. 1981), applying it in a burglary case.

conclude that sufficient similarities, and sufficient distinctiveness, were shown to warrant admission of the evidence under the exception as generally stated in McCormick, § 190(3). Although some of the common "marks" proffered by the State are themselves unremarkable and therefore entitled to little or no weight, others, in combination do tend to show a *modus operandi* that is distinctive. The method of encounter—showing a similar family picture, politely asking directions, engaging the victim in innocent, nonthreatening conversation—is itself a distinctive "mark" under the cases. The immediate choking, ultimately to the point of unconsciousness, the particular attack upon the face and neck, the fact that all three attacks occurred mid-day when a housewife might be home alone—each, and all together, tend to make even more specific the *modus operandi.* We therefore find no error in the admission of the testimony of Mmes. White, Breed, and Chapdelaine as it pertained to the "other crimes."

Appellant's attack on Larry Boddie's testimony is separately based.

Mr. Boddie was an acquaintance of appellant; he was called to testify about some statements made to him by appellant on October 14, 1984—one day before the Sharon Breed incident and two days after the Workman crimes. It was initially thought that he would testify that appellant had told him that he (appellant) intended to commit some future crime; the State apparently wanted the testimony to connect appellant to the Breed offense committed the next day, and appellant objected on the ground that it was not needed for that purpose—that he was already sufficiently connected with that offense. The objection was made, on that basis, when the prosecutor asked "[w]hat did the defendant first say to you?"

In response to that question, once the objection was overruled, Mr. Boddie said that appellant had indicated that "he needed some money and needed it fast" and that "he was going to do some wrong." Boddie further stated,

however, in response to additional questions, that appellant also acknowledged having "murdered someone" in Montgomery County—that he had "strangled her in Montgomery County and knocked her unconscious, went for the jewelry and she came to and he had to knock her out again. . . ." No objection was made to the questions eliciting that answer and no motion was made to strike the response.

 Appellant now complains about both aspects of Boddie's testimony. His complaint about the second, more damaging, aspect comes too late. Md. Rule 1085. As to the first part, we would observe that (1) appellant has conceded the State's need for "other crimes" evidence (see *ante*), (2) we have concluded, on the record as a whole, that the "other crimes" evidence was admissible under the "signature" exception, (3) in order to establish the necessary predicate for the "signature" exception, it was important for the State to connect appellant to the Breed incident, (4) notwithstanding that there was other evidence so connecting appellant, he did not concede the connection but apparently maintained and intended to argue that he was not involved in that incident, (5) in that setting, any competent evidence that would serve to show that he was indeed Ms. Breed's assailant would be relevant, and (6) the testimony apparently anticipated by counsel might well have been relevant and admissible for that permitted purpose. The actual response, it seems to us, fell far short of the anticipated mark—i.e., its probative value on the issue of whether appellant was the person who assaulted Ms. Breed was, at best, strained and tenuous; but no objection or motion to strike the answer on that basis was made. We therefore find no ground for reversal.

### (2) *The Bus Transfer*

 As we have indicated, the crime was committed in the early afternoon of October 12, 1984, the time of death

being estimated at about 1:15 p.m. It was discovered about 5:00, when the mother of one of the children with whom Ms. Workman was babysitting came to the apartment to retrieve her child. The police and paramedics were called and responded promptly.

The apartment—particularly the bedroom where the body was discovered and the kitchen—was in a state of considerable disarray. The police made a complete and detailed investigation and took with them a number of items of physical evidence. They returned to the apartment several times during the ensuing days, padlocking and sealing the apartment door as they left each time. Their last visit revealed in the record before us was on October 17. Inferentially, the apartment was not specially sealed thereafter.

On November 1, 1984, Mr. Workman and his mother-in-law, Margaret Hayes, came to the apartment to pack up a few remaining articles of Ms. Workman's clothing. Mr. Workman had stated in earlier testimony that the door to the apartment had three locks on it—one in the doorknob "which, when turned, would open" plus a bolt lock and a chain on the inside of the door. As they entered the apartment, Ms. Hayes noticed a piece of paper on the floor; it was a D.C. Metro bus transfer dated October 12, 1984. She handed it to Mr. Workman, who put in on the kitchen counter and immediately called the police. The police came and took possession of it.

The transfer, as it turned out, was an important piece of circumstantial evidence linking appellant to the crime. Of particular relevance was the fact that it was dated (October 12) and torn in a manner indicating that it was issued in the District of Columbia at about 10:30 in the morning. The transfer was identified at trial by both Mr. Workman and Ms. Hayes. Detective Krest testified that the transfer had been turned over to him by Detective Peters, that he placed it in a white envelope and turned it over to Detective Gill for fingerprint examination, that except for a "purplish

tinge" where the transfer was "treated for fingerprint examination," he received it back from Detective Gill in the same condition, and that he retained custody of it thereafter. When the transfer was offered into evidence, defense counsel complained, "Objection, chain of custody, Your Honor. My understanding from the testimony is that it is not complete." The court responded that the item had been identified and was "unique enough to not have to prove the chain of custody."

Appellant complains both about the 19–day delay in the discovery of the item, postulating the possibility that it was placed in the apartment after October 12 by someone other than him, and also about perceived gaps in the chain of custody following Mr. Workman's discovery on November 1.

The law in this area was summarized by us in *Amos v. State*, 42 Md.App. 365, 400 A.2d 468 (1979). Relying principally upon *Nixon v. State*, 204 Md. 475, 105 A.2d 243 (1954), and *Breeding v. State*, 220 Md. 193, 151 A.2d 743 (1959), we said [42 Md.App.] at 370, 400 A.2d 468:

"To be admissible ... 'real evidence' must be in substantially the same condition that it was in at the time of the crime and must be properly identified.... Although there is a natural inference or presumption of continuance in the same condition, that inference varies in each case with the nature of the subject matter and the time element....

Whether real evidence is in the same condition as at the time of the crime so as to permit admissibility is not entirely a discretionary matter with the court, ... although the circumstances surrounding its safekeeping in that condition in the interim need only be proven as a reasonable probability.... The proof negating the probability of changed conditions between the crime and the trial, is spoken of as proving the chain of custody, and in most instances is established by accounting for custody of

the evidence by responsible parties who can negate a possibility of 'tampering' and thus preclude a likelihood that the thing's condition has changed."

(Citations omitted.) Compare Md. Code Ann.Cts. & Jud. Proc. art., §§ 10–1001—10–1004 providing more specific requirements for controlled dangerous substances and opinions regarding cadavers.

It is *possible*, as appellant argues, that someone other than appellant could have placed the transfer in the apartment after October 12. There is no evidence that anyone did so or had any reason to do so. For the first five days, the apartment had a police padlock on it; thereafter, inferentially, it was locked with its regular lock. The transfer was dated; after October 12, it was useless. That someone would obtain and carry around a worthless piece of paper, find a way to get into the apartment, and place it there may comport with conjecture but hardly with probability. The delay in discovery, we think, goes to the weight of the evidence, not its admissibility. *See Edwards v. State*, 194 Md. 387, 401–02, 71 A.2d 487 (1950). As to the post-discovery custody, the only missing link seems to be between Mr. Workman and Detective Krest. But Mr. Workman and Ms. Hayes identified the item at trial. That, we believe, suffices. There was a sufficient accounting for the evidence to "preclude a likelihood that the thing's condition has changed." *Amos, supra*, [42 Md.App.] at 370, 400 A.2d 468.

### (3) *Appellant's Arrest*

Appellant was arrested on October 15, 1984—just after the Breed incident. Upon and following his arrest, which was made on the street without benefit of a warrant, certain items were taken from him that were eventually placed into evidence. Appellant complains that those items should have been suppressed because his warrantless arrest was illegal. We dealt with precisely that issue in appellant's appeal from his conviction in the White case, *Moore v.*

*State,* 71 Md.App. 317, 525 A.2d 653 (1987). For the reasons set out in that Opinion, we find no merit to this complaint.

### (4) *Identification Instructions*

█ The court instructed the jury with respect to eyewitness identification. The pertinent part of its instruction was as follows:

> "You should ... consider the witness' certainty or lack of certainty and the witness' credibility or lack of credibility as well as any other fact relevant to any identification such as corroboration by other direct or circumstantial evidence.
>
> You have heard evidence that prior to this trial various witnesses identified the defendant by viewing him at a crime scene in photographs or in a line-up, both in this case and the other two cases. It is up to you to determine the reliability of those identifications and to weigh them accordingly. You may give them as much weight or as little weight as you think they are entitled to be given."

Appellant complained that the instruction was "incomplete." He asked that the court further instruct the jury to consider any "misidentifications" or failures to identify, having in mind the fact that Ms. Chapdelaine made a misidentification in a photo spread (though she correctly identified him at a lineup) and that she was unable to identify him in court. The court refused to supplement its instruction.

We find no error. The subject was fairly covered by the instructions given. Md. Rule 4–325(c); *Bartholomey v. State,* 260 Md. 504, 532, 273 A.2d 164 (1971), *modified on other grounds* 408 U.S. 938, 92 S.Ct. 2870, 33 L.Ed.2d 759 (1972).

JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.