556 A.2d 701

**Tony Cornelius BEST**

v.

**STATE of Maryland.**

**No. 916, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

April 27, 1989.

244

Mark Colvin, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellant.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams, Jr., State's Atty. for Prince George's County of Upper Marlboro, on the brief), for appellee.

Submitted before MOYLAN, GARRITY and BLOOM, JJ.

MOYLAN, Judge.

The appellant, Tony Cornelius Best, was convicted by a Prince George's County jury, presided over by Judge Jacob S. Levin, of 1) possession of cocaine with intent to distribute and 2) possession of marijuana with intent to distribute. Upon this appeal, he raises the following contentions:

1. that Judge Levin erroneously failed to suppress the physical evidence;

2. that Judge Levin erroneously admitted evidence notwithstanding the failure of the State to establish an ostensibly critical link in the legally mandated chain of custody;

3. that Judge Levin erroneously admitted expert testimony regarding the characteristic use of automobile telephones by narcotics dealers;

4. that Judge Levin erroneously failed to instruct the jury fully with respect to the chemical characteristics of contraband cocaine; and

5. that the sentence imposed was illegal.

### *Traffic Law: Signalling a Turn*

■ Commendably, counsel for the appellant has simplified the suppression issue for us. His attack is narrowly focused. Our response will be correspondingly narrow.

At about 5:30 p.m. on September 27, 1987, the police stopped a BMW driven by the appellant and occupied by two passengers. We are mercifully spared the minute dissection of an escalating series of events progressing from the failure of the appellant to have his driver's license with him to his use of a wrong name to the discovery of outstanding arrest warrants for one of the passengers to the subsequent discovery of an open container of an alcoholic beverage to the recovery of marijuana from the passenger compartment followed by the appellant's attempted flight and subjugation leading in turn to an inventory search of the vehicle which ultimately yielded cocaine from the car trunk. Bursting forth from every seam of the appellant's brief is the allusive contention, lurking behind the formal contention, that the traffic stop was but a subterfuge for the search for narcotics. Appellant's counsel, however, with a sure sense of the juridical limits, recognizes the inherent difficulty with any such complaint. Carefully crafted fact finding, with some supporting evidence, is virtually invulnerable to disciplined appellate review. Legal decisions, unlike factual decisions, are, on the

other hand, classic grist for the appellate mill.  The appellant focuses, therefore, upon one such legal decision.

The single issue is whether the initial stop for a routine traffic violation was, even granting it surface credibility, legitimate.  It is agreed by all that the appellant made a right-hand turn from 55th Avenue onto Quincy Street without giving any directional signal.  There is, moreover, some evidence that the police car was travelling on 55th Avenue behind the appellant's vehicle at the time the appellant made the turn.  At the very least, the police car had been behind the turning vehicle and was still in the immediate area.  Md. Transp. Code Ann. § 21–604(c) (1987) provides:

"(c) Required signals.—A person may not, *if any other vehicle might be affected by the movement,* turn a vehicle until he gives an appropriate signal in the manner required by this subtitle." (Emphasis supplied).

■ The appellant argues that the State failed to show that the police car might have been affected by the movement.  The argument is that unless the State has affirmatively proved that another vehicle is actually following the turning vehicle and following closely enough to be adversely affected by the absence of the signal, the State has failed to prove the condition precedent for the requirement that the warning be given.  Such is far too narrow a reading of the traffic law, which deals with left-hand turns and right-hand turns alike and which is intended to alert other vehicles in the vicinity coming in from all points of the compass.  Judge Levin ruled, quite properly we hold, that the requirement to signal a turn is intended to benefit all other vehicles in the area, whether such vehicles are following the turning vehicle, approaching the turning vehicle from the front, or moving in upon the turning vehicle from an intersecting highway.  Judge Levin ruled:

"The Court:  All right, fine.  My interpretation of the statute, after I have thought about it over lunch time, is that to adopt your theory, you have eliminated anybody behind you, and fine, there is no point in telling me anything else.  Your interpretation of the statute is that

you have got to have somebody come in and say, I have to be affected by that failure for him to give a right turn. That is not the intent of this statute.

The intent of this statute is to warn all traffic, either intersecting traffic or traffic behind you, that you intend to make a right turn or a left turn. The statute doesn't say anything about left turn or right turn, it says, any kind of turn. That you have to give a signal and in my judgment, the purpose of the statute is not only to give a warning to people that are coming at an intersecting highway but also the people that are behind you and accordingly, I find it was a valid stop and accordingly, the motion to suppress is denied."

We hold that Judge Levin was correct. The traffic stop followed a legitimate traffic violation and that is all that is before us on this contention.

### The Chain of Custody

■ The appellant's second contention is that the State failed to prove a sufficient chain of custody as to both the marijuana and the cocaine. Md.Cts. & Jud.Proc.Code Ann. § 10–1003 (1984) provides, in pertinent part:

"In a criminal proceeding, the prosecution shall, upon written demand of a defendant filed in the proceedings at least five days prior to a trial in the proceeding, require the presence of the chemist, analyst, or any person in the chain of custody as a prosecution witness. *The provisions of §§ 10–1001 and 10–1002 concerning prima facie evidence do not apply to the testimony of that witness.*"[1] (Emphasis supplied).

---

1. To keep § 10–1003 in proper perspective, it is necessary to read the sentence giving a defendant the right to demand the production of certain witnesses not in a vacuum but in conjunction with the immediately following sentence that denies the State the otherwise available shortcut of offering a documentary record in lieu of the live witness. Even more valuable to the appreciation of proper perspective is an awareness that § 10–1003 should never be read in isolation but only in relation to the immediately preceding §§ 10–1001 and 10–1002, which it qualifies. Section 10–1003 is not an exclusionary rule, but

Four months prior to trial, the appellant filed a written request demanding the presence of all persons in the chain of custody. He now complains that a crime lab technician, Fenton Henson, was not called to the stand and that Fenton Henson was a "person in the chain of custody." We are called upon, *inter alia,* to determine what the necessary conditions are for one to be deemed "in the chain of custody."

As we begin our analysis, let our approach be clear. We believe that the State in this case carefully touched all of the procedural bases and that there was no failure of compliance, even in the most technical sense, with the even arguable requirements of § 10–1003. Lest the appellant be diverted onto some wasteful quest to prove to the contrary, however, we would emphasize that our ultimate holding as to the admissibility of the evidence does not depend upon such technical compliance. Under the circumstances, we have no intention of haggling or wrangling needlessly over the punctuation, over the grammar, or over some hyper-literal implication of this or any other rule. A rule—any rule—does not exist for its own sake alone but only to serve an undergirding purpose. When in our judgment that undergirding purpose has *clearly* been served, we are not about to worry over whether there has been blind and literal obedience to the rule in the tradition of a Prussian drillmaster. The purpose of the rule under consideration is to guarantee the integrity of the physical evidence. The service of that larger purpose, and that alone, is our guiding principle.

Resort to that overriding principle is not necessary in this case, however, because we hold that there was no failure of compliance with § 10–1003, even if the section requires what the appellant thinks it requires. The basic rule with

---

only a set of qualifications on an otherwise extraordinary inclusionary rule. When the qualifications are not satisfied, we are simply back where we were before the entire set of rules was even promulgated.

respect to the reception of physical or "real" evidence was well summarized by Judge Lowe in *Amos v. State*, 42 Md.App. 365, 370, 400 A.2d 468 (1979):

"To be admissible ... 'real evidence' must be in substantially the same condition that it was in at the time of the crime and must be properly identified.... Although there is a natural inference or presumption of continuance in the same condition, that inference varies in each case with the nature of the subject matter and the time element....

Whether real evidence is in the same condition as at the time of the crime so as to permit admissibility is not entirely a discretionary matter with the court ...; although the circumstances surrounding its safekeeping in that condition in the interim need only be proven as a reasonable probability.... The proof negating the probability of changed conditions between the crime and the trial, is spoken of as proving the chain of custody, and in most instances is established by accounting for custody of the evidence by responsible parties who can negate a possibility of 'tampering' and thus preclude a likelihood that the thing's condition has changed."

*See also Nixon v. State*, 204 Md. 475, 105 A.2d 243 (1954); *Breeding v. State*, 220 Md. 193, 151 A.2d 743 (1959); *Moore v. State*, 73 Md.App. 36, 50–52, 533 A.2d 1 (1987).

Under those principles, as they have developed at the common law generally and under the common law of Maryland specifically, what is necessary to negate the likelihood of tampering or of change of condition will vary from case to case and from one type of evidence to the next. Arguably, controlled substances are more vulnerable to tampering or to commingling than would be, for instance, a stolen portrait or a valuable diamond necklace. Although the implementation of the principles will of necessity vary from one set of circumstances to the next, the basic rules remain the same.

In the case of the "Chain of Custody" with respect to "Controlled Dangerous Substances," however, Chapter 794

of the Acts of 1974 altered, in several regards, the general common law principles. Three sections—10–1001, 10–1002, and 10–1003—were added to the Courts and Judicial Proceedings Article. The overall purpose of the legislative change was to make it easier to introduce physical evidence, at least in those cases where the integrity of the evidence was not in genuine dispute.

Section 10–1001 provides that under certain specified conditions, the report of the chemist or analyst will suffice as *prima facie* evidence of the test result and it will not be necessary for the State to produce the chemist or analyst as a live witness. That is a sensible and practical shortcut for those cases where the test result is not in serious dispute. Section 10–1002 provides the same sort of documentary shortcut for the establishing of "the chain of physical custody or control of evidence." Again, the salutary purpose of the law is to relieve the State of the burden of proving in a vacuum those things that are not genuinely in issue.

Section 10–1003 is the safety catch. It spells out two circumstances whereunder the State will not be permitted to resort to such evidentiary shortcuts. One is where the State has failed to give notice to the defendant or his counsel at least ten days prior to the introduction of 1) the written report (in lieu of the chemist) or 2) the written statement as to the chain of custody (in lieu of the live witnesses). The second is where the defendant, as in this case, has requested the presence in court of "the chemist, analyst, or any person in the chain of custody."

The clear thrust of § 10–1003 is not to establish new rules of admissibility generally but rather to provide exemptions from the "shortcuts" of §§ 10–1001 and 10–1002. The effect of a defendant's request for the presence of the chemist, the analyst, or any other person in the chain of custody, is clear. "The provisions of Sections 10–1001 and 10–1002 concerning *prima facie* evidence do not apply to the testimony of *that* [requested] witness." (Emphasis supplied). There is yet a further effect. Section 10–1003

makes it clear that the obligation is not cast upon the defendant to produce any of these persons as defense witnesses. It is rather the case that upon the proper request, "... the prosecution shall ... require the presence of [any such requested person] as *a prosecution witness.*" (Emphasis supplied).

Section 10–1004 provides a similar evidentiary shortcut with respect to bodies delivered to the medical examiner's office in homicide cases. Unless a defendant specifically requests that a witness who had custody of the body be produced, a written statement establishing the chain of custody will suffice.

■ That the purpose of Chapter 794 of the Acts of 1974 was to facilitate the admission of evidence and not to require the exclusion of evidence was made clear by the preamble to the Act, which provided that it was being enacted " [f]or the purpose of providing for *the admission of* written reports of analyses of, and statements of the chain of custody of, suspected controlled dangerous substances as *prima facie* evidence and for exceptions thereto." (Emphasis supplied).

In *Knight v. State,* 41 Md.App. 691, 692, 398 A.2d 811 (1979), Chief Judge Gilbert discussed this legislative purpose of facilitating the admission of evidence:

"By the enactment of Laws 1974, ch. 794, now codified as Courts art. §§ 10–1001 to 10–1003 inclusive, the General Assembly provided that it would not be necessary for the chemist to appear as a witness in a trial of a person for violation of this State's Controlled Dangerous Substances Laws, Md. Ann. Code art. 27, §§ 276–302, to establish the proper chain of custody *unless the defendant complies with the statutory prerequisite spelled out in Courts Art. § 10–1003."* (Footnote omitted). (Emphasis supplied).

We spoke to the same effect in *Gillis v. State,* 53 Md. App. 691, 697–698, 456 A.2d 89 (1983):

"The Legislature in adopting the sections of the law here under consideration created a *prima facie* presumption in favor of the report of a chemist analyzing an alleged controlled dangerous substance. *See* Section 10–1001. It also provided that for the purpose of establishing custody a statement signed by those persons having custody of the evidence must be delivered to the next person on the list. This is *prima facie* evidence that the person had custody and made delivery as stated and acts so as to preclude the necessity of the appearance of that person in court. *See* Section 10–1002."

It is clear with respect to the three new statutory sections that the first two provide evidentiary shortcuts and the third spells out the exceptions to those shortcuts. In *Parker v. State*, 72 Md.App. 543, 545, 531 A.2d 1035 (1987), Judge Bell discussed first the two evidentiary shortcuts:

"Maryland Courts and Jud.Proc. Code Ann. § 10–1001 provides a mechanism by which a chemist's report of analysis of an alleged controlled dangerous substance may be admitted as *prima facie* evidence, ' [f]or the purpose of establishing that physical evidence in a criminal ... proceeding constitutes a particular controlled dangerous substance ...', without the necessity of the chemist appearing in court. Section 10–1002 makes similar provision as to the chain of custody report."

He went on to examine § 10–1003 and summarized the exceptions it provides, at 72 Md.App. 546, 531 A.2d 1035:

"Thus, the chemist's report and the chain of custody form are *prima facie* evidence of their contents only if (1) they are furnished to the defendant at least ten days prior to their introduction at trial and (2) a defendant does not make written demand, in a timely fashion, for the production of the chemist or persons in the chain of custody as prosecution witnesses."

There is not the remotest suggestion of any legislative intent to make the admissibility of "real" evidence or the proof of a chain of custody more difficult than it had been before the passage of the new statute. The three closely

related sections, read in conjunction with each other, clearly facilitate admissibility (subject to the two exceptions) rather than create some new ground for exclusion. When the defendant, pursuant to § 10–1003, demands the production of certain witnesses, the State may not resort to the documentary shortcuts but must follow routine practice as spelled out in such cases as *Amos v. State, supra; Moore v. State, supra; Nixon v. State, supra;* and *Breeding v. State, supra.* When the exceptions apply, the State is no better off than it was before the 1974 statute eased its burden of production. In no event, however, is the State in a more difficult position than it had been in prior to the 1974 statute.

In *Colesanti v. State,* 60 Md.App. 185, 190, 481 A.2d 1143 (1984), Judge Adkins strongly suggested that the defendant's demand under § 10–1003 throws the State back upon the general rule of *Amos v. State, supra:*

> "Because of his notice under § 10–1003, Colesanti was entitled to require the State to establish that the foil packet was the very packet given by him to Detective Kilmer, that it was unchanged between the time Kilmer received it and the time of trial, and that it contained a controlled dangerous substance. *Gillis, supra,* 53 Md. App. at 697–98, 456 A.2d 89. *Amos v. State,* 42 Md.App. 365, 370, 381, 400 A.2d 468 (1979)."

In *Gillis v. State, supra,* the State's failure to produce two (perhaps even three) key links in the custodial chain or any alternative guarantee of trustworthiness ("The State did not produce any evidence as to the remaining witnesses' participation in the handling of the alleged contraband." 53 Md.App. at 697, 456 A.2d 89) would have required exclusion even under the general principles of *Amos v. State, supra.*

That the entire statutory scheme did not establish any new admissibility requirements but simply permitted "an authenticated method of proof" except where § 10–1003 made that "authenticated method" unavailable was made clear by Judge Bishop, in *One 1979 Cadillac Seville v. State,* 68 Md.App. 467, 471–472, 513 A.2d 927 (1986):

"Appellant argues that the statute implicitly requires a chemical analysis because its final sentence provides that any party may offer other evidence 'supporting or contradicting the evidence contained in . . . the report.' Appellant reads this provision out of context and simultaneously ignores the clear language of the statute.

.   .   .   .   .

The language in § 10–1001 is clear and unambiguous. It does not require the admission of chemical analysis in either a civil or criminal case to prove the identity of a given substance. The statute simply recognizes that chemical analysis of drugs is reliable evidence and creates a statutory exception to the hearsay rule by providing that it is not necessary to produce the chemist who performed the test to testify to its accuracy in every trial where a chemical analysis conducted by a qualified person under approved procedures has been submitted. *The statute permits an authenticated method of proof, but does not require a chemical analysis* to prove that the substance in question is indeed a controlled substance." (Emphasis supplied).

Judge Gilbert's very thorough discussion of § 10–1003 in *Knight v. State,* 41 Md.App. 691, 398 A.2d 811 (1979), made it clear that that section has no substantive life of its own but simply spells out the procedures that must be followed by the State in order to utilize the evidentiary shortcuts of §§ 10–1001 and 10–1002 and the procedures that must be followed by the defendant to avoid those evidentiary shortcuts. The evidentiary shortcuts are an abridgement of the full-fledged right of confrontation. Unless the statutory conditions are satisfied, therefore, there is a violation of that right of confrontation. "To admit the report over objection was error going to the fundamental right of an accused to be confronted by her accusers." 41 Md.App. at 696, 398 A.2d 811. The cure for a violation is the production of the live witness rather than the production of an out-of-court declaration (the chemist's written analysis):

"We note that this whole issue could have been avoided if, when the objection to the admission of the report was made, the State had withheld the report and produced the chemist. Alternatively, the trial judge could have declined to receive the report and directed the State to produce the chemist to testify."

41 Md.App. at 696, 398 A.2d 811. In the case before us, of course, the State offered no such out-of-court declaration so as to offend the right of confrontation.

Some of our language in *Parker v. State*, 72 Md.App. 543, 548, 531 A.2d 1035 (1987), did, to be sure, treat § 10–1003 as establishing preconditions for the admissibility of this type of evidence rather than simply spelling out the procedures circumscribing the use of the evidentiary shortcuts in the two immediately preceding sections. In partial response, ch. 719 of the Acts of 1988 amended § 10–1002 by defining more modestly the "chain of custody." Subsection (a) now reads:

"(a) In this part:

(1) 'Chain of custody' means:

(i) The seizing officer;

(ii) The packaging officer, if the packaging officer is not also the seizing officer; and

(iii) The chemist or other person who actually touched the substance and not merely the outer sealed package in which the substance was placed by the law enforcement agency before or during the analysis of the substance; and

(2) 'Chain of custody' does not include a person who handled the substance in any form after analysis of the substance."

Although that amendment, which became effective on July 1, 1988, does not affect the case before us, it does, we find, reflect a less rigid legislative intent behind all three sections initially enacted by the Acts of 1974.

At a more fundamental level, our concern is with the ultimate integrity of the physical evidence. In the service

of that concern, the State should establish every important link, perhaps even every link, in the chain of custody rather than bridge gaps, large or small, with a "leap of faith." In the present case, there were no missing links and, therefore, no leaps of faith were required.

Four distinct stages were involved in the passage of the physical evidence from the arrest scene to the ultimate analysis by the chemist. The first stage involved parallel actions by two separate officers, one with respect to the marijuana and the other with respect to the cocaine. Officer Maurice Hicks seized 19 bags of suspected cocaine from the trunk of the appellant's automobile, placed them in a lock-sealed envelope, and put the envelope into the drug mailbox at the Hyattsville police station. Officer John Rasmussen seized a plastic bag of marijuana from the passenger area of the appellant's car, placed it into a lock-sealed envelope, and then placed that envelope into the same drug mailbox at the Hyattsville police station. Both officers testified and there was no problem with respect to this first link in the chain of custody (more literally, with these respective first links in the two chains of custody).

Stage two was the same with respect to both chains of custody. George Robey, a civilian employee in the Property Section of the Prince George's County Police Department, testified that he removed both State's Exhibit 4 (the cocaine) and State's Exhibit 5 (the marijuana), from the drug mailbox at the Hyattsville police station and placed them in the warehouse narcotics vault. There was no problem with respect to this second link in the chain.

The third link involved Corporal A.J. Coleman on two different days. On October 5, 1987, he removed State's Exhibit 5 from the narcotics vault and hand-carried it to the Prince George's County drug lab. He did precisely the same thing with State's Exhibit 4 on October 14. On both occasions, Corporal Coleman delivered the package to Fenton Henson, the intake officer at the lab. It was the failure of the State to call Henson as a witness that gave rise to the present complaint. Had Corporal Coleman departed,

leaving sole custody of the evidence in Henson, there would have been, in our judgment, an arguable violation of *Parker v. State*'s interpretation of § 10–1003. On both occasions, however, Corporal Coleman remained. He stood there watching as Henson opened the packages, examined their contents, saw that what was inside matched the description written on the chain of custody logs, handed the logs back to Corporal Coleman, and placed the exhibits in the lab's vault. Everything Henson did was under the watchful eye of Corporal Coleman. Indeed, it was Corporal Coleman who personally resealed the evidence envelopes after their examination and before they were placed in the vault. There was no gap in the chain and no "leap of faith" was required. The integrity of the evidence was not in doubt.

Laura Bosseler, the forensic chemist at the Prince George's County Police Department's Drug Analysis Lab, testified that she retrieved the two exhibits from the laboratory vault and conducted the tests upon them. There was no problem with that final link in the chain.

We hold that Fenton Henson was simply not an indispensable link in this chain of custody, whose presence was mandated. The chain was complete without him. During the only stage involving him, two custodians—Henson himself and Corporal Coleman—were contemporaneously present, either of whom could have served as the testimonial guarantor as to the integrity of the evidence during that stage. The extra witness was redundant. Had Fenton Henson had an assistant standing at his side and had Corporal Coleman had a police cadet attending him, those additional witnesses would have been equally redundant. We see no error.[2]

---

**2.** If for any reason, our reading as to what is necessary to comply with the rule should be deemed erroneous, we do not hesitate on the facts of this case to hold, in the alternative, that such error was harmless beyond a reasonable doubt. If there was no possible tampering with the evidence, there was self-evidently no prejudice to the appellant.

## *Drug Dealers and Car Phones*

■ The appellant's third contention involves a matter which is quintessentially within the wide discretion of the trial judge—a ruling on the relevance of evidence. Corporal James Tayman testified as an expert witness on the habits, procedures, and mores of the drug culture. He testified, for instance, that the street value of the 59.9 grams of marijuana recovered from the appellant was approximately $250 and that the street value of the 19 packages of cocaine was approximately $1,900. The present complaint is about his expert testimony, over objection, as to the possible significance of the presence of a car phone with respect to the drug culture. That testimony was:

"The Witness: Car phones are becoming very common in the drug culture. One, it gives the drug dealers the mobility to use a phone while they are in the car, calling the potential buyers, telling them to meet them somewhere. It is very hard for the police to put wiretaps or other investigative, what we call, DNR's, dial number recorders, or such, on car phones. They have become very popular in the drug trade and are frequently used by drug dealers."

Significantly, the appellant here is not arguing the subject of "relevance and its counterweight" of prejudice. He does not urge upon us the proposition that even relevant evidence must sometimes be foregone when the possible prejudice outweighs that relevance. He is arguing simply about the lack of relevance *per se,* not about its relative weight in comparison to countervailing prejudice.

Evidence is relevant, of course, if it makes the proposition it is offered to prove more likely true than that proposition would be without the questioned evidence. It becomes necessary, therefore, to identify the proposition in this case that the expert testimony was offered to prove.

The appellant suggests that it was offered in a vacuum to prove that the appellant dealt in drugs. He urges that "persons who own car phones" is too broad a class and that

most of the members of that class are innocent of any involvement in the narcotics traffic. We think the appellant is focusing on too broad a sample and on too broad a proposition. The State did not need the car phone to prove that the appellant possessed drugs. The appellant was caught red-handed with the drugs. The car phone could little add or detract in that regard. What then was the issue?

Even granted possession, the question remained whether the appellant was guilty merely of simple possession or of possession with intent to distribute. The expert testimony of Corporal Tayman was very relevant on the proposition that the appellant was not a large-scale consumer of drugs but an actual distributor of drugs. On that issue, the sample became not "all automobiles that have car phones" but rather "all automobiles carrying significant quantities of drugs that have car phones." This is a much smaller sample and one wherein "the tools of the trade" take on greater significance.

Were the members of this Court sitting as jurors, we would find the presence of equipment frequently associated with the selling of drugs probative on the issue of whether a possessor of drugs was also a seller. Guided by the helping hand of the expert, we can appreciate that a busy distributor, far more than a casual consumer, needs to be in regular contact with his agents upon the street. We can appreciate that a frequently exposed distributor, far more than the occasional consumer, has a compelling need to avoid telephonic surveillance. Were we on the cusp of doubt between mere possession and possession with intent to distribute, the presence of such tell-tale equipment would help us resolve that doubt. By definition, that makes the evidence relevant. *A fortiori*, the ruling by Judge Levin that it was relevant was not a clear abuse of discretion on his part.

### The Cocaine Isomer Defense

■ The appellant's fourth contention goes only to the cocaine charge and has no bearing on the marijuana convic-

tion. It involves the so-called cocaine isomer defense, which we have not seen before in Maryland. It is both ingeniously clever and intellectually challenging. It offers nothing, either by way of evidence or theory, that is affirmatively exculpatory. It is exclusively a procedural technique, in the tradition of an intercollegiate debater for the negative side, of putting the prosecution through the procedural paces, ideally with no advance warning, and then hoping that the prosecutor fails to clear one of the unanticipated hurdles. The first time around the league at least, it frequently throws unwary opponents (and legal umpires as well) for a loop. The realization of its inherent lack of substance, however, ultimately catches up with it.

It first appeared in the Seventh Circuit in 1976 in the case of *United States v. Orzechowski*, 547 F.2d 978 (7th Cir. 1976). It took four more appearances, however, before *United States v. Bockius*, 564 F.2d 1193, 1194 (5th Cir. 1977), descriptively pinned down both its provenance and its essential strategy. As Judge Wisdom described it, the defendant Bockius, freshly returned to Miami from Columbia, " [a]t the last moment, apparently to surprise the government, ... produced as the chief trial lawyer the architect of the chemical defense theory in prosecutions over the importation, possession, or sale of cocaine." Judge Wisdom both identified this "architect" and noted his formidability:

"The day before trial, the prosecution learned that James Shellow, well known as an expert in defending cocaine charges, would join Bockius' two attorneys who had already filed notices of appearance. Shellow had originated a sophisticated scientific defense grounded in the chemistry of cocaine. In the trial he conducted what may properly be described as an extraordinarily able examination of the witnesses, based on his knowledge of the chemistry of cocaine."

564 F.2d at 1195.

The federal prosecutor, however, was also resourceful and the Justice Department network was up to the chal-

lenge. An additional test was ordered, the results of which were not forthcoming until the trial was well in progress:

"The Assistant United States Attorney handling the case was wise enough to confer with a United States Attorney in another office who had faced Shellow before. He learned that Shellow's trial strategy was to show that the Government had not met its burden of proof. This Shellow did by impeaching government testing procedures. His tactic was to contend that to identify L-cocaine, the government scientists should conduct a polarimeter test.

Until acquiring this information, the United States Attorney in the case had not requested the government expert, Donald A. Cooper, to conduct a polarimeter test. The United States Attorney asked him to do so, but had not received the results of this belated test when he began to present his case. Nor did he know about the results during direct examination. The expert Cooper relied upon other tests to establish that the substance in question was L-cocaine. Shellow, during cross-examination, asked Cooper if he had conducted the polarimeter test. Cooper answered affirmatively and stated that the substance taken from Bockius's shoes was L-cocaine." (Footnotes omitted).

564 F.2d at 1195.

The Fifth Circuit showed no sympathy when the defense suddenly claimed that *it* had itself been surprised:

"Bockius charges prejudice because he was forced, at the last minute, to change his strategy from one of impeaching the thoroughness of government testing procedure to one of rebutting the actual test results. We do not sympathize with the defense attorneys' dismay when they discovered that their impeachment defense had been anticipated; obviously they had expected to surprise the government."

564 F.2d at 1196. Judge Wisdom elaborated:

"The appellant's claim of prejudice must be weighed in the context of the actions by his own counsel. Shellow's

involvement was concealed from the government until the day before the trial. The defense gave no indication it would rely upon the inadequacy of the government testing procedures."

564 F.2d at 1197. In affirming the conviction, the Fifth Circuit concluded, "There was an attempted ambush in this case, but ... the defense was the predator." 564 F.2d at 1198.

Before turning to the substance of the cocaine isomer defense, we note that in the case before us the defense, as in *Bockius,* gave no warning of its intent to challenge the adequacy of the testing procedures and first raised the challenge only in the cross-examination of the State's chemist. There was, to be sure, no legal requirement to signal reliance on an unorthodox defense. It does, however, help to set the mood to know that we are dealing not with an instance of outraged innocence but rather with an opportunistic effort to catch an opponent offguard.[3]

The cocaine isomer defense is a purely theoretical defense grounded in James Shellow's solid mastery of organic chemistry. As the federal cases describe the underlying scientific theory, "cocaine, like most organic compounds, has

---

**3.** The First Circuit in *Chappee v. Vose,* 843 F.2d 25, 34 (1st Cir.1988), noted this heavy reliance on the element of surprise:
"If the prosecution and its chemist were caught unaware, perhaps even so fragile a straw as the isomer strategy might carry the day."
In upholding the right of the trial court to preclude the testimony of three defense experts who had not timely been discovered to the prosecution, the Court noted, at 843 F.2d 31:
"[D]etermining the truth is a complicated business, and its achievement can be thwarted as easily by 'springing' surprise testimony on an unsuspecting opponent—especially surprise testimony of a highly technical nature—as by presenting perjured testimony.... Here, ... concealing the witnesses' identities could only be thought 'motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence.' ... Once the Commonwealth had been cradle-sung into a false sense of security, and Gagnon subjected to cross without fair warning of the nature of the defense, Chappee's chances of success—admittedly slim at best—were (unfairly) maximized. Such buccaneering cannot be countenanced."

many 'isomers.'" *United States v. Hall*, 552 F.2d 273, 274 (9th Cir.1977). Isomers, in turn, are defined as "two or more compounds which have the same molecular formula but different molecular structures. The variations in structure *may* give rise to different chemical characteristics." *Id.* (Emphasis supplied). In the simplest example we can think of, water has the molecular formula of $H_2O$, meaning that two atoms of hydrogen are somehow "hooked up" with one atom of oxygen in a particular structural configuration. If two atoms of hydrogen could hypothetically be "hooked up" with an atom of oxygen in a different structural configuration (linking up, for instance, at 9 o'clock and 12 o'clock on the oxygen atom's orbital circle rather than at 9 o'clock and 3 o'clock), then the two configurations would be isomers of each other, each having a common molecular formula ($H_2O$) but a different molecular structure.

It seems to be universally accepted that there are eight such isomers or theoretically possible molecular structures for the molecular formula known as "cocaine." *United States v. Kolenda*, 697 F.2d 149, 150 (6th Cir.1983); *United States v. Francesco*, 725 F.2d 817, 820 (1st Cir.1984). As an indication of how purely theoretical the cocaine isomer defense is, there are suggestions, "that at least two" of these isomers are only "theoretical isomers, not presently in existence." *United States v. Ortiz*, 610 F.2d 280, 282 n. 5 (5th Cir.1980); *United States v. Hall*, 552 F.2d 273, 276 (9th Cir.1977).

Those eight isomers break down into two sets of four isomers, each set being the mirror image of the other. The only difference between the respective mirror images is in "the direction a crystal [of the particular isomer] will rotate plane-polarized light passed through it." *United States v. Bockius*, 564 F.2d 1193, 1195 n. 2 (5th Cir.1977). The four isomers that will rotate the plane of polarized light to the left (counterclockwise) carry the prefix "L" (for Levo) and the four isomers that will rotate the plane of polarized light to the right (clockwise) carry the prefix "D" (for Dextro). The eight isomers are:

| "L" Set | "D" Set |
|---|---|
| L–cocaine | D–cocaine |
| L–pseudo–cocaine | D–pseudo–cocaine |
| L–allocaine | D–allocaine |
| L–alpha cocaine | D–alpha cocaine |

It is also generally accepted that of these eight isomers, only L–cocaine is "natural," to wit, derived from the coca leaf. The other seven are synthetic. *United States v. Ross*, 719 F.2d 615, 617 (2d Cir.1983).

The issue that the cocaine isomer defense seeks to raise is that of whether the substance recovered from the defendant and analyzed by the chemist is, indeed, a controlled substance within the strict definition of the law. Md.Ann. Code Art. 27, § 279(b) (1987) tracks Schedule II(a)(4) of 21 U.S.C. § 812(c) (1976) and provides:

"The following are controlled dangerous substances and are included in this schedule:

a. Any of the following substances except those narcotic drugs listed in other schedules whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by combination of extraction and chemical synthesis:

1. ... coca leaves ...;

2. Any salt, compound, derivative, or preparation of ... coca leaves ...;

3. Any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of the substances referred to in clauses 1 and 2, except that these substances shall not include decocainized coca leaves or extraction of coca leaves, which extractions do not contain cocaine or ecgonine...."

L–cocaine alone qualifies under a.2. as a "derivative ... of ... coca leaves." The other isomers, if it should become an issue in the case, would have to qualify under a. 3. as "chemically equivalent or identical with [L–cocaine]." *Unit-*

*ed States v. Ortiz,* 610 F.2d 280, 281 (5th Cir.1980), describes the defense:

> "The basis of the strategy is an assumption that only one of eight isomers of cocaine, the L-cocaine isomer, is a 'controlled substance' under the federal narcotics laws. All isomers are similar, and it is contended that certain types of government testing procedures are incapable of differentiating the allegedly legal isomers from the concededly illegal isomer, L-cocaine." (Footnote omitted).

*United States v. Ross,* 719 F.2d 615, 617–618 (2d Cir.1983), expands that slightly to provide for the case of chemical equivalency:

> "[C]ocaine has eight isomers, only one of which, L-cocaine, is a derivative of the coca leaf. Since the other seven isomers are synthetic, they are 'controlled' by the statute only if they are 'chemically equivalent or identical with' L-cocaine. The burden was therefore on the government to prove at trial that the substance Ross possessed was either L-cocaine, or that it was chemically equivalent or identical to L-cocaine."

*United States v. Orzechowski,* 547 F.2d 978, 980 (7th Cir. 1976), speaks to the same effect:

> "Those isomeric forms of cocaine which can be derived from coca leaves are controlled, but any isomers that cannot be so derived are controlled only if they are chemically equivalent or identical to the forms which are derived from the plant. Isomers are commonly referred to as chemical relatives."

As we turn this body of case law on the issue at hand, our task is simplified at the outset. Dr. Bosseler, the forensic chemist, performed three relatively standard tests—1) a color test, 2) a crystal test, and 3) an infrared spectography test—in determining that what the 19 seized bags contained was, indeed, cocaine hydrochloride. Those tests also eliminated six of the isomers—six of the seven theoretical alternatives to "natural" cocaine or L-cocaine. Eliminated were Pseudo-cocaine (L and D), Allocaine (L and D), and Alpha cocaine (L and D). The routine tests could not discriminate,

however, between L-cocaine and D-cocaine, because those two isomers share not only the same molecular formula but also the same molecular structure save only that they are reverse images or mirror images of each other. Only three tests—1) the polarimeter test, for sure, and probably 2) the mixed melting point test, and 3) the gold chloride microcrystalline test—are capable of making that more subtle discrimination. *United States v. Luschen*, 614 F.2d 1164, 1168 (8th Cir.1980); *United States v. Bockius*, 564 F.2d 1193, 1194–1195 (5th Cir.1977). Thus, we were apparently left with the choice described by *United States v. Orzechowski*, 547 F.2d 978, 980 (7th Cir.1976):

> "[O]ne of the isomers of cocaine, l-cocaine, can be obtained from the plant, but ... one of the other isomers of cocaine, d-cocaine, cannot be so derived. D-cocaine to be controlled, therefore, must be shown to be chemically identical or equivalent."

In holding against the appellant on this contention, our reasons are several. The contention, to begin with, does not involve the legal sufficiency of the evidence to convict but deals exclusively with jury instructions. The appellant had, pursuant to Maryland Rule 4–325(b), submitted a written request for a jury instruction, which read in pertinent part:

> "You must be convinced beyond a reasonable doubt that the substance in question was either a compound, derivative, salt, or preparation of the coca leaf. You must be convinced beyond a reasonable doubt that the substance in question was l-cocaine, or levo-cocaine, and not one of the other isomers of cocaine."

Judge Levin was correct in rejecting that instruction because it totally failed to recognize the possibility that one of the "non-natural" or synthetic isomers of cocaine could nonetheless qualify under the statute if it was shown to be "chemically equivalent or identical with" the natural derivative of the coca leaf.

Assuming that the issue of the D-cocaine isomer was properly in the case, the requested instruction was wrong

and misleading in several regards. Had the jury believed that the substance in this case was possibly D-cocaine, the instruction would, in effect, have improperly directed a verdict for the appellant, for D-cocaine is not a natural derivative of the coca leaf, and that was the only theory of guilt the instruction offered the jury.

■ The fatal gap in the requested instruction omitted more than a theoretical possibility, for there was, we hold, legally sufficient evidence in the case from which the jury could reasonably have inferred that D-cocaine is, indeed, the chemical equivalent of L-cocaine. Both L-cocaine and D-cocaine were described by Dr. Bosseler as "cocaine hydrochloride." Both were described as having the same molecular formula. Both were described as having the same molecular structure except that they are mirror images—exact replications of each other in reverse. Most chemical tests cannot distinguish between the two. This alone is a sufficient predicate to permit a reasonable inference of chemical equivalency.

The chemical equivalency that concerned the legislature, moreover, was clearly an equivalency with respect to the substance's narcotic effect upon a user. The packaging of the substance in 19 glassine bags—a classic merchandising routine in the narcotics trade; its close proximity to a significant supply of marijuana; and its transportation in the trunk of a car equipped with car telephones, all combine to suggest that this substance had a narcotic value on the streets of Prince George's County. The legitimacy of these latter characteristics as part of the predicate for a permitted inference of chemical equivalency finds support in *United States v. Orzechowski,* 547 F.2d 978, 983 (7th Cir.1976), dealing with analogous behavior:

> "The defendant in this case at the time of the first sale represented the white powder to be good quality cocaine. He then came back to sell a second time after knowing that the buyer intended to check the powder he had sold him the first time. The defendant represented the powder to be high quality cocaine and expressed a strong

desire and motivation for future larger sales based on that representation. The jury, therefore, had some basis under these circumstances for giving this defendant at least a little credit for knowing what he was talking about when he represented the powder to be good quality cocaine."

The jury in this case could similarly have reasonably inferred that the 19 glassine bags did not contain an innocuous non-narcotic substance of no value in the trade. To have value on the street, it had to be either L-cocaine or some narcotic equivalent. That such nonexpert and circumstantial evidence is not only relevant to but may even be legally sufficient to resolve the scientific issue was made clear by *United States v. Hall,* 552 F.2d 273, 276 (9th Cir.1977):

"In this case, while the evidence does not definitively exclude the possibility that the substance sold by Hall was not natural cocaine or its chemical equivalent, there was sufficient evidence for the question to go to the jury.... *[W]hile Medina's tests could not distinguish between the isomers of cocaine, there was extensive circumstantial evidence showing that the substance was natural cocaine* derived from coca leaves (l-cocaine) rather than d-cocaine. The government presented evidence that d-cocaine was difficult and expensive to make. More importantly, the experts had never actually found a specimen of d-cocaine. Finally, d-cocaine could be synthesized anywhere, according to the experts, yet instead of basing his operations in the interior United States, there was evidence that Hall was engaged in a smuggling operation to bring drugs into the United States from Mexico. This evidence, with reasonable inferences drawn therefrom, is more than adequate to permit a rational conclusion by the jury that the substance sold by Hall was, beyond a reasonable doubt, cocaine." (Emphasis supplied).

The Fourth Circuit has been particularly emphatic in rejecting this appellant's notion that a mere raising of the

cocaine isomer defense imposes upon the State the burden of proving by scientific tests and experts that an illegal isomer of cocaine rather than a possibly innocuous isomer is involved. It has held that lay testimony alone is enough to establish that the seized substance is contraband cocaine within the contemplation of the narcotics laws. In *United States v. Scott*, 725 F.2d 43, 44–45 (4th Cir.1984), the Court summarized the defendant's argument:

> "It is the defendant's position, however, that the testimony of the witnesses ... was insufficient to prove that the substance possessed by her was the controlled substance cocaine. In advancing this position, the defendant relies on what has come to be known as the 'cocaine isomer strategy' or defense.... It follows under this theory that in order to find a controlled substance under § 812, the Government must prove that the substance in question is specifically L-cocaine and not D-cocaine. Whether a substance fits the test of L-cocaine, as distinguished from D-cocaine, can be determined, under the conventional argument, only by the use of a polarimeter test. Following this reasoning, the defendant in this case claims that, since the Government's evidence consists of merely lay testimony on the nature of the substance in question, there is a fatal absence of proof that the substance purchased and received by her was L-cocaine and thus within the statutory prohibition." (Footnotes omitted).

In rejecting that argument, the Court relied exclusively on lay testimony about characteristic behavior in the drug culture:

> "The substance had the appearance of illicit cocaine; when sampled and tested by an experienced user of cocaine, it had the effect of cocaine; the price paid for the substance was 'high;' its sale and delivery were conducted furtively and with deviousness; and finally, all persons dealing with the substance treated and dealt with it as cocaine. This evidence was found sufficient in *Dolan* to

meet the Government's burden of proof and we find it sufficient in this case."

725 F.2d at 46. The earlier case of *United States v. Dolan,* 544 F.2d 1219, 1221 (4th Cir.1976), had held flatly:

"Second, lay testimony and circumstantial evidence may be sufficient, without the introduction of an expert chemical analysis, to establish the identity of the substance involved in an alleged narcotics transaction."

*See also United States v. Gregorio,* 497 F.2d 1253, 1263 (4th Cir.1974). *And see One 1979 Cadillac Seville v. State,* 68 Md.App. 467, 472–473, 513 A.2d 927 (1986).

The appellant's reliance on *United States v. Ross,* 719 F.2d 615 (2d Cir.1983), is misplaced. The trial judge in *Ross* had instructed the jury, as a matter of law, that D-cocaine "is the chemical equivalent or identical to L-cocaine." 719 F.2d at 618. That instruction constituted reversible error in two regards. In the first place, it had no support in the evidence. In *Ross,* unlike in the case before us, "no evidence had been offered to prove that the synthetic D-cocaine was chemically equivalent or identical with" L-cocaine. *Id.*

In the second place, although there is a factual possibility that the two isomers are "chemically equivalent or identical with" each other, that proposition is by no means such a scientific certainty that it can be stated, yes or no, as a matter of law. Indeed, the courts have regularly rejected any instruction that states, as a matter of law, that D-cocaine is not chemically equivalent or identical to L-cocaine. *United States v. Orzechowski,* 547 F.2d 978, 985 (7th Cir. 1976); *United States v. Hall,* 552 F.2d 273, 274 (9th Cir. 1977); *United States v. Bockius,* 564 F.2d 1193, 1194 n. 1 (5th Cir.1977); *United States v. Gregorio,* 497 F.2d 1253, 1263 (4th Cir.1974); *United States v. Scott,* 725 F.2d 43, 45 (4th Cir.1984). It is a factual proposition, thus far at least, which is contingent upon the facts in each particular case and as to which a jury may find either way. Although the factual predicate in *United States v. Orzechowski,* 547 F.2d 978, 981–982 (7th Cir.1976), was slightly more substantial

than the factual predicate here, that case stands unequivocally for the proposition that the issue of the chemical equivalency of the two isomers is not one for judicial fiat but for factual resolution by the jury:

"The quality of the Government's case on the issue of identification of the white powder substances left something to be desired, but not so much as to require that the jury's verdict be set aside....

In reviewing the sufficiency of this evidence we do not act as the trier of the facts to reconsider guilt or innocence. Our purpose is to determine if a rational trier of the fact could have found beyond a reasonable doubt that the defendant sold a controlled substance as charged. In resolving that issue we must view the evidence and all reasonable inferences therefrom in the light most favorable to the Government, remembering, also, the jury's right to weigh the evidence, determine the credibility of witnesses, and draw justifiable inferences....

Even though the Government expert's foundation for his opinion that l- and d-cocaine are chemically equivalent or identical was limited, he was found to be an expert by the court, and his training and experience justified permitting him to state and explain his opinion. That his opinion was disputed and contradicted by the defendant's expert who stated the contrary as a matter of scientific fact does not require that the Government expert's opinion be totally rejected by this court as a matter of law." (Citations omitted).

Indeed, *United States v. Hall*, 552 F.2d 273, 275 (9th Cir.1977), was a case where opposing experts gave diametrically opposed opinions on the chemical equivalency issue:

"Hall called his sole witness, Shapiro, to testify concerning the properties of the two isomers. Shapiro testified that d-cocaine is not the chemical equivalent to l-cocaine and that d-cocaine would have a different physiological effect on the human body than l-cocaine. Prior to this testimony, Medina had also discussed the properties of

the two isomers, stating that they 'would behave chemically equivalent [sic] . . . except for the rotation of the polarized light . . . in the polarimeter.' Thus, both witnesses indicated that there were some differences between the two isomers, although there was an apparent conflict as to whether there was a chemical equivalency."

Even assuming that the cocaine isomer defense was properly an issue in this case, the only two isomeric possibilities for the captured substance were L-cocaine and D-cocaine. If L-cocaine, it clearly was a "controlled" derivative of the coca leaf. If D-cocaine, there was legally sufficient evidence to permit the inference that it was the also "controlled" chemical equivalent of L-cocaine. Thus, the requested jury instruction that totally rejected that second possible predicate for a verdict of guilty was properly refused.

Our rejection of the cocaine isomer defense, however, is more broadly based. Several observations in that regard are pertinent. The most salient observation is that the defense is a product of the "think tank" and not of the real world. We have discovered 13 federal cases, spanning nine of the judicial circuits, dealing with the cocaine isomer defense. In not one of them is there the remotest indication that any witness had ever found present any isomer other than the natural L-cocaine. There is no hint of any synthetic drug production intended to undercut the importation of natural cocaine from Latin America. The defense experts, including the ubiquitous Dr. Robert Shapiro, professor of chemistry at the University of Colorado, are never brought forward by the defense to conduct their own polarimeter (or other) test but only to testify, in the abstract, about the inadequacy of the tests run by the prosecution experts. The comment made by the Supreme Judicial Court of Massachusetts in *Commonwealth v. Chappee*, 397 Mass. 508, 492 N.E.2d 719, 725 (1986), captured the essence of what the defense consisted of, as it noted that:

"... the defendant's experts proposed only to challenge the efficacy of the Commonwealth's testing procedures,

rather than to express their own opinion of the composition of the substance...."

Not only has none of the cases ever suggested the actual presence of D-cocaine instead of L-cocaine but some of the authorities have expressed doubt even as to D-cocaine's existence. *United States v. Posey,* 647 F.2d 1048, 1051 (10th Cir.1981), observed:

"The Government presented evidence that D-cocaine was difficult to make and that D-cocaine had never been seen apart from L-cocaine. More importantly, the experts had never actually found a specimen of D-cocaine."

*See also United States v. Scott,* 725 F.2d 43, 45 n. 4 (4th Cir.1984).

The Fourth Circuit has been especially disdainful of the cocaine isomer defense. In *United States v. Fince,* 670 F.2d 1356, 1357–1358 (4th Cir.1982), it denied a defense request for the appointment of an expert to determine the isomer of the cocaine for the possession of which the defendant had been convicted. The Court observed:

"[W]e are also of the opinion that the appointment of an expert would have served no useful purpose whatever in this case. In requesting the appointment, counsel indicated that she desired to develop what has been termed as an 'isomer defense' upon the theory that there are certain species of cocaine which are not violative of the federal statutes covering the subject. Such a 'species defense' was summarily rejected by us with respect to marijuana in *United States v. Sifuentes,* 504 F.2d 845 (4 Cir.1974), and in our opinion, the 'isomer defense' proposed by the appellant in this case is equally meritless."

The mischief of the cocaine isomer defense is obvious and manifold. If a court can be persuaded that there is a burden upon the prosecution to negate, in a vacuum, the existence of some phantom possibility that no one has actually ever seen, the prosecution might easily fail to prove a legally sufficient case. In the alternative, the judge might give, as is contended here, an inadequate jury in-

struction. If neither of those errors should occur, there would nonetheless remain the real possibility that the jury might be hopelessly confused by arcane complexities beyond its competence. As the Fifth Circuit observed, in *United States v. Bockius,* 564 F.2d 1193, 1194 (5th Cir. 1977):

"There was much throwing about of brains. Defense counsel exhibited models of the molecular structure of cocaine isomers and skillfully extracted from his expert and the government expert as much or more knowledge of the cocaine isomers than a jury could absorb."

The appellant has relied exclusively upon *United States v. Ross,* 719 F.2d 615 (2d Cir.1983), almost as upon holy writ. What he neglects to point out, but which our own research has developed, is that of the 13 discovered decisions, spanning nine federal circuits, dealing with this defense, *Ross* is the only case in which it has prevailed. Even the *Ross* holding is narrow, reversing a conviction simply because a jury instruction stated the proposition that "D-cocaine is the chemical equivalent of L-cocaine" as a matter of law, whereas that determination should have been left for the jury as a matter of fact. Since *Ross,* even the Second Circuit has declined to give it the broad reading urged by defendants. In *United States v. Puglisi,* 790 F.2d 240, 242 (2d Cir.1986), the Court declined to place upon the government the broad obligation, in the abstract, to prove that the cocaine in issue was the L-cocaine isomer rather than some other isomer:

"Because no issue was raised as to which isomer of cocaine was involved here, the Government was not required to offer evidence on the matter."

As to the cocaine isomer defense generally, *Chappee v. Vose,* 843 F.2d 25, 34 (1st Cir.1988), has observed that the "isomer defense, such as it was, had not enjoyed much success in other cases." Not even crediting *United States v. Ross, supra,* as a defense victory, the First Circuit pointed out, at 843 F.2d 33 n. 6:

"Chappee's counsel have been unable to point to a single reported case where an isomer defense was instrumental in gaining acquittal, and our independent research has been similarly unavailing. The defense, though ingenious, seems to have been widely rejected."

The First Circuit, before itself becoming the ninth circuit to address the cocaine isomer defense, had observed in *United States v. Francesco*, 725 F.2d 817, 820 n. 1:

"Eight circuits have addressed some form of a cocaine isomer defense claim.... Only the Second Circuit, however, has overturned a conviction on the basis of the defense."

The legislative response to the cocaine isomer defense has been just as disdainful as has the judicial response. The Comprehensive Crime Control Act of 1984 amended Title 21 so as to include in Schedule II "cocaine and ecgonine and their ... isomers." 21 U.S.C. § 812(c). The purpose of the amendment was clear. *United States v. Puglisi*, 790 F.2d 240, 242 n. 1 (2d Cir.1986), stated, "These amendments were intended to render the 'isomer defense' ineffective." *Chappee v. Vose*, 843 F.2d 25, 33 n. 6 (1st Cir.1988), similarly observed, "We note, too, that the Congress amended the federal narcotics laws in 1984 to afford the isomer strategy a decent burial."

Maryland similarly amended its law but only by ch. 683 of the Acts of 1988, effective July 1, 1988. Md.Ann.Code Art. 27, § 279(b)3 a.4. now reads:

"Coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed; cocaine, its salts, *optical and geometric isomers, and salts of isomers;* ecgonine, its derivatives, their salts, *isomers, and salts of isomers;* or any compound, mixture, or preparation which contains any quantity of any of the substances referred to in this paragraph." (Emphasis supplied).

Although that amendment came too late, of course, to affect directly the criminal conduct in this case, it does

reflect the recognition by the General Assembly, following the earlier recognition by the United States Congress, that there is no intrinsic merit in the cocaine isomer defense.

Although all of the judicial responses, with the single exception of *United States v. Ross, supra,* did not allow the cocaine isomer defense to prevail, they floundered about in terms of approach. We think the soundest response was that employed by *United States v. Francesco,* 725 F.2d 817 (1st Cir.1984), which we adopt and, to some extent, elaborate upon. The basic response of the First Circuit was that no jury instruction is called for which is not supported by the evidence in the case. The evidence showed that the substance recovered from the defendant was "cocaine." In the absence of any evidence that the substance was not covered by the criminal statute, the Court held:

"Although the government has the burden in a criminal case of proving every element of the offense charged, it has no burden of proving that a term used in its commonly understood sense has no other possible meaning—at least until the possibility of another meaning is raised by the defense."

725 F.2d at 821.

The basic holding of the Court was:

"The defendant's failure to introduce evidence in support of his isomer defense left the judge (whose instructions to the jury must be based on the evidence adduced at trial) no choice but to instruct the jury that cocaine is a Schedule II controlled substance."

725 F.2d at 821–822.

We believe that the First Circuit in this case was on the right track but that its reasoning needs at least some elaboration. The sum total of all of the responses to the cocaine isomer defense is that it is an exercise in futility, frequently working much mischief, to require the State, in a vacuum, to negate theoretical defenses that have not been shown to be anything more than textbook or chemistry laboratory possibilities. This is the classic and most effica-

cious function of a Thayer–Wigmore "bursting bubble" presumption.

When all of our experience shows that the cocaine recovered from drug traffickers is the natural derivative of the coca leaf, there arises a Thayer–Wigmore presumption that any substance shown by normal testing to be cocaine is that natural derivative. The burden of production is cast upon the party raising the remote and exotic possibility to generate a genuine jury issue in that regard. If and when that is done, the presumption is dissipated—the bubble bursts—and the burden is rightfully cast upon the prosecution to negate such a possibility.

That this doctrinal approach is constitutional is clear. *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *Evans v. State,* 28 Md.App. 640, 349 A.2d 300 (1975), *aff'd. State v. Evans,* 278 Md. 197, 362 A.2d 629 (1976). Although a burden of ultimate persuasion may never be cast upon a defendant in a criminal case, the burden of production is frequently upon a defendant to generate a genuine jury issue (such as mitigation in a homicide case or self-defense) before the burden shifts to the State to negate that defense by persuasion beyond a reasonable doubt.

We hold, furthermore, that to generate a genuine jury issue in this regard does not mean simply raising the theoretical possibility of such a substance. It requires some evidence that the nontraditional isomer is actually present in a given case.

### *Probation is a Substitute, Not a Supplement*

The appellant's final contention is that the sentence imposed was in part illegal. We agree. For the possession with intent to distribute cocaine, the appellant was sentenced to ten years imprisonment. For the possession with intent to distribute marijuana, he was sentenced to a consecutive term of four years. Neither sentence was suspended,

in whole or in part. The sentencing judge went on to announce:

"[W]hen and if you are released, I'm going to put you under the supervision of the Department of Parole and Probation for a period of five years."

Md.Ann.Code Art. 27, § 641A provides that a defendant may be placed on probation if the sentencing judge has suspended the imposition of a sentence or has suspended all or part of the execution of the sentence. In this case, neither of those things was done. The condition precedent for placing a defendant on probation never having occurred, the placement of the appellant on probation for a period of five years following his release from prison was beyond the authority of the court. Probation is a substitute for imprisonment, not a supplement to it.

JUDGMENTS MODIFIED AND, AS MODIFIED, AFFIRMED; COSTS TO BE PAID BY APPELLANT.